IN THE

# SUPREME COURT

OF

# OREGON

Decided January 28, 1908.

## TURNER'S WILL.

[93 Pac. 461.]

WILLS—EXECUTION—UNDUE INFLUENCE.

1. Evidence examined, and *held* to show that the will was the free and voluntary act of the testatrix, and not the result of fraud, duress, or undue influence of any one.

NATURE OF TESTAMENTARY POWER.

2. Every person possesses absolute dominion over his property, and may bestow it upon whomsoever he pleases without regard to natural or legal claim upon his bounty, if he possesses testamentary capacity and exercises his own individual will and judgment in the matter.

VALIDITY—UNDUE INFLUENCE.

3. A mere confidential relation existing between the testator and a beneficiary under his will, or the opportunity of such beneficiary to exercise undue influence over the testator, is not enough to avoid a will, but fraud or undue influence to set aside a will, must be such as to overcome the testator's free volition or conscious judgment and to substitute the wicked purposes of another instead, and must be the efficient cause without which the obnoxious disposition would not have been made.

EVIDENCE—CONFLICTING STATEMENTS OF TESTATRIX.

4. Evidence of a statement of a testatrix, made after the execution of her will, that she had given her home place to one son and the rest of her property to her other children in equal shares, while the will gave such son substantially all her property, leaving only a cemetery lot to pass by the residuary clause to her other children, although it might be admissible to show the state of her mind, and whether she fully understood what she was doing when she made her will, is no substantial proof of fraud, duress, or undue influence.

From Umatilla: HENRY J. BEAN, Judge.

Statement by MR. CHIEF JUSTICE BEAN.

This is a proceeding instituted in the county court of Umatilla County to have the probate of the will of Cyn-

thia A. Turner revoked and the will set aside. The will was executed October 7, 1901, and the testatrix died August 30, 1905. At the time of her death she left surviving her, seven children and one grandchild. Her husband, and the lather of these children, died on May 26, 1898, leaving a will, in which, after bequeathing to each of his other children the sum of $50, he devised and bequeathed the remainder of his property, consisting principally of a farm near Weston, to his youngest sons, Samuel O. and Oliver C., charged with the payment of one-third the rent therefrom to his wife, during her lifetime. These two sons were 26 and 28 years of age, respectively, at the time of their father's death, and had, since their majority, lived with and assisted in the support of their parents. After the father's death, the eldest of them (Otis) resided on the farm which had been devised to himself and brother, and the youngest (Chauncey) lived with his mother in a house belonging to her in the town of Weston.

About the 1st of October, 1901, Mrs. Turner was in poor health, and went to the hospital at Walla Walla for treatment. Chauncey accompanied her, and remained a day or two before returning home. After diagnosing her case, her physician, finding she was suffering from an ailment that would require a surgical operation, advised her to that effect, and at his suggestion she consented to submit to the same. A few days before the time fixed for the operation, she inquired of her physican if he thought she had better make a will, and he told her that she need feel no alarm as to the result of the operation, but thought it a good idea for every person to have a will. When her son Chauncey was advised of the day the operation was to be performed, he went from Weston to Walla Walla to see his mother, and to remain with her until after the operation. She told him to secure the services of an attorney to prepare her will, as she had concluded to make one. He

tried to persuade her to abandon the idea, assuring her that she was in no danger from the contemplated operation, but she was persistent, and, after consulting her physician and being told by him that it could do no harm for his mother to make a will, he, accompanied by the physician, called on Judge Dumphy, a lawyer in Walla Walla, and requested him to prepare the will. Dumphy visited the hospital, obtained the necessary data from the testatrix, returned to his office, prepared the will, and took it back to the hospital, where it was duly and regularly executed and witnessed, after which it was placed in a sealed envelope by Dumphy, and, at the request of the testatrix, taken by her son Chauncey to Weston, and deposited with her other papers in the local bank, where it remained until after her death some four years later.

At the time of her death, Mrs. Turner owned and possessed a house and four and one-half lots in Weston, where she and her son Chauncey had resided for several years, of the probable value of $1,500, and personal property consisting principally of cash, amounting to about $4,000. After providing for the payment of her debts and funeral expenses, she declared, by the second clause of her will, her desire that the will and testament of her husband, deceased, should be executed and carried into effect, according to the terms and tenor thereo°, and devised and bequeathed to her two sons, Otis and Chauncey, any interest in her husband's estate of which she might die seised. By the third clause she devised and bequeathed to her son Chauncey her home place in Weston, and all personal property of every kind and description situated and located in that town; and in the residuary clause gave the names of all her children and heirs, except Chauncey, and devised to them all the rest, residue, and remainder of her estate, both real and personal, share and share alike.

The will was duly proved and admitted to probate in

common form, September 5, 1905. A petition was filed in the county court for Umatilla County, June 20, 1906, by some of the heirs, praying for an order revoking the former probate and setting the will aside on the ground: (1) A want of testamentary capacity at the time it was executed, and (2) that it was induced by the fraud and undue influence of the chief beneficiary thereunder. After issue joined in the county court, testimony was taken, upon the consideration of which that court sustained the will and dismissed the petition. From this decree the contestants appealed to the circuit court, with like result, and they now bring the case to this court for final adjudication.          AFFIRMED.

For the appellant there was a brief and oral arguments by *Mr. Charles H. Carter* and *Mr. Will M. Peterson.*

For the respondent there was a brief with oral arguments by *Mr. James A. Fee* and *Mr. Gilbert W. Phelps.*

MR. CHIEF JUSTICE BEAN delivered the opinion.

The averment that Mrs. Turner's mental and physical condition was such, at the time the will was executed, as to render her incapable of intelligently disposing of her property, has been abandoned by the contestants, and their sole reliance is upon the contention that the will was the result of the fraud and undue influence of her son Chauncey. The only witnesses who gave any definite or direct testimony concerning the making of the will and the circumstances surrounding its execution are Dr. Nelms, the attending physician, Chauncey Turner, chief legatee and devisee thereunder, and Judge Dumphy, who drew the will, and was present when it was executed.

1. Dr. Nelms testified that while Mrs. Turner was in the hospital in Walla Walla, and after he had concluded that an operation was necessary, she asked him if he thought she had better make a will, as she was afraid the operation was going to be serious; that witness told her that he did not want her to feel alarmed about the

result of the operation, but thought it a good idea for all persons to have a will; that she asked him who he would advise her to get to prepare the will, and he told her he thought Garrecht & Dumphy would be competent; that neither of her sons, Otis nor Chauncey, were present at that time or in Walla Walla; that Mrs. Turner told him she wanted her husband's wishes carried out, and that she was going to give Chauncey a home, or what she had, or something to that effect (witness could not exactly remember) because he had been with her all the time and taken care of her, and she wanted to make a liberal provision for him.

Chauncey Turner testified that he lived with his father and mother before his father's death, and with his mother afterwards, until her death; that Otis lived on the farm during his father's lifetime and after his death; that his mother visited in Tacoma in 1901, returning to Weston in September; that soon afterwards she went to Walla Walla to consult a physician, and on the 3d of October of that year went to the hospital for the purpose of submitting to a surgical operation, and, at her request, he went with her; that he was at the hospital when the operation was performed and two or three days before that time; that he never undertook to induce his mother to make a will in his favor or to persuade her not to give as much to other members of the family as to himself, and never spoke to her about a will at his own instance, and that his mother acted of her own free will and according to her own judgment in everything she did; that two or three days prior to the operation he went to Walla Walla to see his mother, and she said to him that the physician had decided to operate on her, and she thought she ought to make a will as she might not live through the operation; that he told her not to do so as she was not in danger; but she insisted upon making a will, and requested him to get somebody to prepare it for

her; that he went to Dr. Nelms' office and spoke to him about it, and the doctor said he thought his mother would recover from the operation, but if she wanted to make a will to let her do so, as it would not do any harm; that he asked the doctor whom to employ to prepare the will, and the doctor took him across the hall to Judge Dumphy's office, and introduced him to Dumphy; that the doctor told Dumphy our business and he said he would call at the hospital and see mother; that he (witness) did not see Dumphy again until after the will was prepared and brought by him to the hospital to be executed; that he was not in his mother's room while the will was being read by Dumphy, or until after it was executed, when he returned to the room, and told his mother she had better pay the lawyer, and at her request, he took from her purse $10 and gave it to him; that he never made any suggestion to his mother as to what should go in the will, nor did she ask him anything in respect to that matter; that after the will was executed he put it in the family deed book in the bank, at her request, where it remained until after her death; that he did not know the contents of the will and his mother never mentioned it to him afterwards, and he never had any conversation with her about giving him the Weston property, and never asked her for it; that he never spoke to his mother about a will, nor she to him, until the day it was drawn; that she never said anything to him about the will or the way she wanted her property to go, and he never saw Judge Dumphy until the day he was introduced to him by Dr. Nelms.

Judge Dumphy testified that he was employed by Dr. Nelms and Chauncey Turner to prepare the will; that they came to his office, and the doctor said they wanted him to draw a will for a lady at the hospital; that he told them he had to go to the court house soon on business, and when through there, would go to the hospital and see Mrs. Turner; that after he finished his

business at the court house he went to the hospital, called on Mrs. Turner, told her his name and that he came to see her about drawing her will; that she gave him the data and told him how she wanted to dispose of her property; that he returned to his office and prepared the will from the memorandum made by him, and then returned to the hospital, where the will was executed; that no one but Mrs. Turner, the testatrix, ever spoke to him about anything contained in the will, and he put into form the data she gave him; that no one else told him about her husband's death or the names or ages of her children, and Chauncey never undertook to talk to him about the will, except to tell him that his mother was in the hospital and wanted a will drawn; that he got all his information from Mrs. Turner, and, so far as he knew, Mrs. Turner dictated the terms of her will.

The evidence of these witnesses is uncontradicted, and the witnesses are unimpeached. In our opinion it shows quite clearly that the will in question was the free and voluntary act of the testatrix, and not the result of the undue influence of her son or anyone else. The principal features relied upon to overcome the effect of this testimony, are the alleged unnatural and unjust disposition made by the testatrix of her property, the opportunity that her son Chauncey had to influence her in the matter of making her will, and testimony that she told some of her children, after the will had been executed, that she made a will giving her home in Weston to Chauncey and the remainder of her property equally to her other children. But these circumstances are not sufficient to justify the court in setting aside a will which clearly appears to have been the free and voluntary act of a competent testator.

2. Every person possesses absolute dominion over his property, and may bestow it upon whomsoever he pleases, without regard to natural or legal claim upon

his bounty, if he possesses testamentary capacity, and exercises his own individual will and judgment in the matter: *Potter* v. *Jones,* 20 Or. 239 (25 Pac. 769: 12 L. R. A. 161).

3. A mere confidential relation existing between the testator and a beneficiary under a will, or the opportunity of such beneficiary to exercise undue influence over the testator, is not enough to avoid a will. The fraud or undue influence that will suffice to set aside a will, "must be such as to overcome the free volition or conscious judgment of the testator, and to substitute the wicked purposes of another instead, and must be the efficient cause, without which the obnoxious disposition would not have been made": *Holman's Will,* 42 Or. 345-358 (70 Pac. 908). Or, as put by Mr. Justice Moore, *In re Darst's Will,* 34 Or. 58-65 (54 Pac. 947), "Influence arising from gratitude, affection, or esteem is not undue, nor can it become such unless it destroys the free agency of the testator at the time the instrument is executed, and shows that the disposition which he attempted to make of his property therein results from the fraud, imposition, and restraint of the person whose superior will prompts the execution of the testament in the particular manner which the testator adopts."

It is said in some cases that when the will of a testator is such that it could not have been made consistent with the claims of natural duty and affection, and a close confidential relation exists between him and the recipient of his bounty, slight evidence that the legatee or devisee had betrayed the confidence placed in him would be sufficient to avoid the will: *Greenwood* v. *Cline,* 7 Or. 17; *Holman's Will,* 42 Or. 345 (70 Pac. 908). But in this case there is not the slightest evidence in the record, that we are able to find, that Chauncey Turner ever attempted to take advantage of the confidential relation existing between himself and his

mother, to unduly influence her in the disposition of her property, or that the terms of her will were ever discussed by them.

4. The statement of the testatrix, made after the execution of her will, that she had given her home place to Chauncey, and the remainder of her property to her other children, in equal shares, is not competent to invalidate the will. These statements may have been admissible to show the state of the testatrix's mind, and whether she fully understood and comprehended what she was doing at the time she made her will, but they afforded no substantial proof of fraud, duress, or undue influence: *Loennecker's Will,* 112 Wis. 461 (88 N. W. 215); *Bevelot* v. *Lestrade,* 153 Ill. 625 (38 N. E. 1056); *Taylor* v. *Pegram,* 151 Ill. 106 (37 N. E. 837); *Trish* v. *Newell,* 62 Ill. 196 (14 Am. Rep. 79).

Much stress was laid by counsel for contestants upon the fact that the only property belonging to testatrix, upon which the residuary clause could apply, was a cemetery lot, and it was stoutly insisted that this is strong, if not conclusive, evidence that the testatrix did not know or comprehend the disposition she was making of her property at the time she executed her will. But the reason for the residuary clause and the object had in view by the draftsman of the will, is explained by Judge Dumphy in his testimony. It was adopted by him as a convenient means of naming all the children and heirs of the testatrix, and providing for the disposition of any legacies which might lapse, and is, therefore, of no particular weight in determining the question whether the will was the free and voluntary act of the testatrix.

Careful examination of the entire record has convinced us, that the decree of the court below should be affirmed, and it is so ordered.          AFFIRMED.