Argued February 4, affirmed April 29, 1953

IN RE ESTATE OF VERD HILL, DECEASED
HILL *v.* HENDERSON, EXECUTRIX

256 P. 2d 735

*W. A. Wiest,* of Independence, argued the cause and filed briefs for appellant.

*Elmer Barnhart,* of Independence, argued the cause for respondent. With him on the brief was Fred W. Calef, of Independence.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, LUSK and PERRY, Justices.

WARNER, J.

This is an appeal in a contest challenging the validity of the last will and testament of Verd Hill. Verda Frances Hill, the decedent's daughter, is the contestant and Constance J. Henderson, his niece, in her capacity as executrix is the proponent. From a decree dismissing the petition, the contestant appeals.

Verd Hill died on December 18, 1950, at the age of 74 years. He left an estate consisting of personal property in the amount of $33,572.49 and real property of the value of $53,740.

The decedent's first marriage was with Frances Helmick when he was about 40 years of age. In March 1918, Verda Hill, his only child, was born to this union. Not long after her birth, and prior to 1921, Frances Hill brought a suit for divorce in Linn county. This was bitterly contested and attended with considerable publicity. It resulted in a dismissal. Later, in 1921, a second suit was brought in Clackamas county by Frances Hill wherein no contest was made. A decree was entered in her favor incorporating the terms of a property settlement, and provision was made for the support and maintenance of their daughter.

In 1931 Verd Hill married Esther M. Hill, who is now his widow. It was not a happy marriage. This was, no doubt, due in part to his extremely penurious ways and fixed and unconventional habits of living. They made their home on farmlands adjoining the city of Independence, from whence the decedent derived the

greater part of his income by the raising of livestock and agricultural activities. No children were born to this marriage and, therefore, his widow Esther and his daughter Verda were his sole heirs at the time of his death.

After her parents were divorced, Verda Hill lived with her mother until the latter's death in 1938 and thereafter with various maternal relatives. This continued separation of Verda from her father and the bitterness engendered by the divorce suits were strong factors tending to alienate the interest and affections of each in the other. During all the years following 1921, Verda and the testator had few social contacts. Only once, when she was very small, was she ever in Verd Hill's home.

Constance Henderson, nee Cohrs, was born in 1919 in Spokane, Washington. She was the only child of Mrs. Garlin Cohrs, the favorite and only living sister of Verd Hill. When Constance was about three or four years old, she moved with her mother and father to Independence where they built a small house south of and adjoining the Hill residence. Here Constance resided for nearly 14 years, that is, from 1923 to 1937, the year her father died and the year she was graduated from the Independence high school. Financial adversity caused the loss of the Cohrs home and, after her father's death, Constance was moved to her Uncle Verd's home and her mother went to Portland to secure employment. Constance in a sense grew up on her uncle's farm. From her earliest day she acquired an interest in his work and apparently spent much time following him around as he did his chores, attended his livestock and gave attention to his haying. During the years 1937-1938 Constance continued to reside with

the Hills while she attended the normal school in Monmouth nearby. In the summer of 1938 she joined her mother and worked in Portland. In September of that year her mother died, leaving her a practically penniless orphan. Thereafter, her uncle's home was where she spent most of her time when not in college or visiting with relatives of her father. This continued until her marriage in 1941.

After patient study and advance detailed preparation on his part, supplemented by further and independent study of a preliminary draft prepared by his own chosen counsel, Verd Hill on May 14, 1948, in the presence of disinterested witnesses, placed his signature upon the instrument which is now the subject of controversy. He not only executed it in the conventional manner but, with the caution and foresight which characterized many of his transactions, he added his name to every sheet of this nine-page instrument in the view of five subscribing witnesses specially invited by him for that purpose.

We shall not encumber the record with a haec verba exposition of the will's 25 separate articles but point only to those which are the agitating source of the disappointment of his daughter Verda and his widow Esther.

Testator's sole bequest to his daughter is found in Article 3. Under this article she receives only $1. By Article 14 he devises a life estate in his home place of nine acres to his wife, terminable upon her remarriage. After making relatively small gifts to relatives, $1,000 to the local Knights of Pythias Lodge and modest allotments for the upkeep of cemetery lots and monuments to relatives and a friend, the testator under Article 21 creates a trust from the rest, residue and

remainder of his real and personal property for the benefit of his widow and other relatives. From the net income of this fund his trustees are directed to pay his wife Esther "one fourth thereof in monthly installments * * * or the sum of $50.00 per month, whichever is greater". These payments were made to begin on the death of the testator.

The provisions made for the testator's niece Constance are variously described by the contestant as constituting the "lion's share", "the largest portion of the estate" or "the bulk of the estate" and prompt reference to Mrs. Henderson as the "principal beneficiary". These generalizations, in our opinion, are extravagant and not warranted by the language of the document under review. After making the special provision above referred to for the widow, the will further provides that the remaining income from the trust shall be divided equally among Constance and decedent's nephews, Wendell H. Denlinger and Ellis J. Burch, with provision that upon the death or remarriage of Mrs. Hill, the real property of the trust shall be divided into three parcels as described therein, with a particular parcel to each of those three relatives. It also gives the niece and nephews named an undivided one third in the residue of the other property in the trust. There is nothing in the record to indicate that the parcel of real property allotted to Constance is disproportionate in value to the parcels set aside to her cousins, Wendell and Ellis, and certainly nothing to justify an appellation of "principal beneficiary", unless we add to the other advantages conferred by the will upon Constance the fees which would accrue to her in her capacity as executrix. At the time the will was made, Constance was a resident of California, a circumstance

rendering this additional benefit one of an uncertain value.

The fact that Constance was more generously endowed by the decedent than were the other feminine members of his family was, no doubt, a tempting excuse and a persuading impulse for the instant litigation—litigation in which the widow gives more than yeoman service to the pretensions of Verda and contributes most of the testimony upon which the contestant rests her case.

It is the claim of the contestant that the testator was mentally incompetent to make a valid testamentary disposition of his property on May 14, 1948, and that his then condition of mind was further inflamed by certain alleged insane delusions which he entertained at that time. Although not specifically stated, it is reasonable to infer that these were supposed to relate to his wife and daughter, the only two beneficiaries who express disappointment concerning the provisions made for them.

Verda Hill also asserts that her cousin Constance availed herself of her uncle's claimed mental infirmities and exercised an undue influence upon him at that time to her unjust enrichment.

The rules of law pertinently applicable to the questions raised by this appeal have been long crystallized. Our sole problem, therefore, is to test the facts as revealed by the record in terms of those controlling and well established canons.

■ Many a contestant's high hopes, destined to disappointment, spring from a carelessly bandied use of that phrase which refers to them as the "natural objects of the testator's bounty." Too many seem to garner therefrom a rule of law not present nor to be implied.

It confers no inferential rights, nor indeed any rights, to take from one dying testate. It compels no duty upon the part of a testator to make any provision for those comprehended by its words. The phrase "natural objects of the testator's bounty" is no more, no less, than a euphemistic way of defining what can be more simply said and with equal meaning, i. e., "next of kin" (*In re Walther's Estate,* 177 Or 382, 397, 163 P2d 285), or as was said in *Page v. Phelps,* 108 Conn 572, 143 A 890, 893, those who "would take in the absence of a will because they are the persons whom the law has so designated." Moreover, a will is not unnatural because it excludes one's next of kin in preference to those who may have enjoyed a closer and perhaps an affectionate relationship with the testator. *In re Walther's Estate,* supra, at page 397; *Allen v. Breding,* 181 Or 332, 343, 181 P2d 783; *Detsch v. Detsch, Administratrix,* 191 Or 161, 170, 229 P2d 264.

■ A will of the kind now under examination may on its face seem to do violence to the ordinary concepts of what is, in terms of family ties and decency, proper if not legally necessary. Because of the evident deep feeling which the Verd Hill will has engendered and with a mistaken belief that the decedent was legally bounden to deal more generously with his daughter, we deem it not amiss to repeat and reaffirm our adherence to Mr. Justice WOLVERTON's clear and persuasive statement on the basic right of one to dispose of his property by will as it pleases him and without consideration for blood or legal ties, except as may be specially mandated by the statutes relating to curtesy and dower and by the more recent enactment conferring on a surviving spouse an election to have a specified interest in the testator's personal property. Ch 475, Oregon

Laws 1949. In *Holman's Will*, 42 Or 345, 356, 70 P 908, Justice WOLVERTON, speaking for the court, said:

"The right of one's absolute domination over his property is sacred and inviolable, so that he may do what he will with his own, if it is not to the injury of another. He may bestow it whithersoever he will and upon whomsoever he pleases, and this without regard to natural or legitimate claims upon his bounty; and if there exists no defect of donative capacity, whereby his individual will or judgment does not have intelligent and conscious play in the bestowal, or undue influence or fraud, whereby an unconscionable advantage may be taken of him through the wicked designs of another, the law will give effect to the disposition; and the right to dispose of one's property by will, and bestow it upon whomsoever he likes, is a most valuable incident to ownership, and does not depend upon its judicious use \* \* \* [citations]. And this court has held, in effect, that 'while it seems harsh and cruel that a parent should disinherit one of his children and devise his property to others, or cut them all off and devise it to strangers, from some unworthy motive, yet so long as that motive, whether from pride or aversion or spite or prejudice, is not resolvable into mental perversion, no court can interfere' \* \* \*.''

Also see *Detsch v. Detsch, Administratrix,* supra, at page 170; and *In re Estate of Moore,* 190 Or 63, 67, 223 P2d 393, where it is said:

"By the law of Oregon as it was when this will was executed, every person of lawful age was competent to devise and bequeath his property by last will to whomsoever he pleased. § 18-101, O.C.L.A. This he might do without regard to natural claims upon his bounty. Turner's Will, 51 Or 1, 8, 93 P. 461; Holman's Will, 42 Or. 345, 356, 70 P 908. \* \* \*''

■ The last will and testament of a decedent is an instrument of such great solemnity, and by which, as

the foregoing cases teach us, the testator is invested by law with substantially all the rights he enjoyed in life to make unfettered disposition of his property, that it will not be set aside in the absence of convincing evidence that it should be. *Trombly et al. v. McKenney, Ex., et al.,* 191 Or 90, 112, 228 P2d 417; *Detsch v. Detsch, Administratrix,* supra, at page 164. Such evidence must produce a conviction (1) that the testator was wanting in testamentary capacity at the time the will was executed or (2) that the testator was subjected to the undue influence of another, resulting in the substitution of that person's will for his own voluntary volition. *Trombly et al. v. McKenney, Ex., et al.,* supra, at page 107.

Here, as we have noted, the contestant daughter of Verd Hill assails his last will and testament on both of those grounds. We shall examine them in that order and now address our attention to the charge of

### Mental Incapacity.

In *In re Estate of Riggs,* 120 Or 38, 48, 241 P 70, 250 P 753, we said: "No particular degree of acumen will serve as a standard for testamentary capacity. Each case is to be decided upon its own facts and circumstances. The question is, Was the will the free and intelligent product of the testator's mind or not? * * *"

■ The tests for determining testamentary capacity have been long and well established and extended citation becomes unnecessary. *Re Phillips' Will,* 107 Or 612, 618, 213 P 627, collates the authorities and presents an excellent summary of the applicable tests as reflected thereby. They are: (1) that at the time of making the will, the testator comprehends the nature of the act in which he is then engaged; (2) that he

knows the nature and extent of the property which makes up his estate and concerning which he intends to make testamentary disposition; (3) that he has in mind the persons who are, should or might be the objects of his bounty; and (4) that he is cognizant of the scope and reach of the provisions of the instrument.

These tests have, since the Phillips case, been repeatedly followed or approved in *Trombley et al. v. McKenney, Ex., et al.,* supra, at page 107; *In re Walther's Estate,* supra, 177 Or 386; *Morley v. Silverton Hospital,* 138 Or 75, 95, 5 P2d 92; *Copenhefer v. Powers,* 137 Or 145, 149, 300 P 505.

▆▆▆ The burden of proof necessary to establish that the testator had testamentary capacity *at the time of the execution of the will* rests upon the proponent, in this instance the defendant Constance Henderson. In this she is favored by a presumption of sanity upon the part of the testator. *Trombly et al. v. McKenney, Ex., et al.,* supra, at page 107, and cases there cited.

As a prelude to our inquiry into the status of the mental capacity of Verd Hill as of the time of the execution of his last will and testament in May 1948, it seems appropriate to garner from the record and here set down some of his social interests and evident business capacity as the same were revealed and known to persons in the community in which he had lived for his entire lifetime.

His place of residence was a large house built by his parents on property which adjoined the city limits of Independence. As we have noted, his income was derived from agricultural and stockraising activities on lands contiguous to his home place. This was supplemented by the profits of shrewd sales of various parcels of real property which he owned. His interest in the

civic affairs of the community is evidenced in many ways. In the earlier part of his life he served as a representative of his county in the sessions of the state legislature. For more than 20 years immediately preceding his death, he was chairman of the election board in his precinct. Hill had long been an active member of the local lodge of the Knights of Pythias, holding various offices in that order. In his earlier days he had been a student at Oregon State College. His advice in business matters was highly esteemed and solicited by various members of the different branches of his family with whom he maintained a close and constant association. He had a special interest in history and geography and was looked upon as somewhat of an authority in matters of that kind, particularly as they related to events and things of his own community. On the day of his death he participated in a parade preceding the ceremonies celebrating the opening of the state bridge at Independence and was among those invited to speak and take a place with state officials and representative citizens on the platform built for that purpose. It was while he was awaiting his opportunity to participate that he was fatally stricken with a heart attack.

Prior to the time of his demise, he was known by friends and familiars to have been in normal health and engaged in the active and successful management of his own affairs in a manner characterized by astuteness. One of the witnesses called by the contestant, a local business executive who had had many dealings with him, both immediately before and after the execution of his last will, describes him as having a sound mind and being shrewd in business dealings. These conclusions were supported with references to par-

ticular transactions. An official of the local bank where he maintained sizeable balances and kept his safe-deposit box, and through which he closed several escrow transactions, describes him as perfectly normal in the business relationships had through that institution. Another witness who was called by Miss Hill and had known her father for 40 or 50 years testifies that Hill had no known serious illnesses and was "fairly active for a man of his years". He characterizes his conversations as "rational". Hill was known to many as one not easily influenced, a stubborn and determined man.

It is, however, evident from the testimony that Verd Hill had acquired habits which were not socially endearing and many of which cannot be commended as evidencing a sensitive regard for the feelings of his wife to a degree commonly exemplified by one partner toward the other in the marital relationship. It is into this background of social and marital digressions from commonly accepted standards of living that the contestant enters to find what she claims shows a mental incompetence sufficient to invalidate the challenged will.

The contestant comes forth with testimony which discloses that the Verd Hill residence had been for many years prior to his death in a bad state of repair; that the decedent was careless and indifferent to the looks and condition of its adjacent premises; that he suffered the grass to go uncut and permitted discarded machinery and parts to remain in the yard; that he was negligent in the care of his livestock and the barn; and that his barn lot remained unclean. On one occasion we are told that the decedent was accused of bringing to his home and using flour and meal that were weevily and, on another, he is said to have served spoiled eggs

to a hired man. There is also testimony that he refused to hire a plumber to repair a septic tank and compelled his wife to clean up the resultant unsanitary matter. Through Mrs. Hill we learn that he seldom had in the house a supply of wood fuel sufficient to maintain a comfortable temperature. Through her we are told that he refused to supply her certain clothing and the kind of food she needed because of her peculiar condition of ill health or to arrange for certain medical treatment elsewhere which she thought might be beneficial.

It is urged by the contestant and admitted by the proponent that the decedent was extremely miserly and parsimonious. It is obvious to us that many of his unpleasant and uncommendable habits and ways of living as above delineated only evidence niggardliness rather than an unsound mind.

In the recent case of *Trombly et al. v. McKenney, Ex., et al.,* supra, 191 Or 106, Mr. Justice Tooze, speaking for the court, said:

"One is not rendered incompetent to execute a will simply because he or she may be slovenly, parsimonious, and eccentric. In modern times, the late Hetty Green, once the world's richest woman, perhaps offered the best example of such a person, yet it is doubtful if anyone would have questioned her testamentary capacity at any time up to the very moment of her death.

"In 1 Page on Wills, 303, § 148, the rule is stated thus:

" 'Eccentricity has no effect on testamentary capacity; and the wills of persons who are highly eccentric, and in some cases eccentric to the verge of insanity, have been upheld. * * * The fact that the testator was filthy, forgetful, and eccentric, or

that he was miserly and filthy * * * or that he was filthy, frequently refused to eat, and would lie in bed with his clothes on * * * or that he was inattentive * * * does not establish lack of capacity.' "

Also see *In re Murray's Estate,* 173 Or 209, 224, 144 P2d 1016; 68 CJ, Wills, 437, § 34.

We shall now turn to examine the record in terms of the tests summarized in *Re Phillips' Will,* supra, 107 Or 618.

There can be no serious doubt that at the time of making the will Verd Hill comprehended the nature of the act in which he was engaged and knew the nature and extent of the property comprising his estate and which was to be the subject of his testamentary disposition. His approach to this task was done with meticulous care, and his devotion to detail is reflected by the provisions of the will itself. The final execution followed only after further and studied reflection. Less litigation would ensue if other prospective testamentary dispositions were framed in the atmosphere of accuracy, caution and prior study that characterized the manner of Verd Hill in the preparation of his own last will.

Prior to going to the office of his lawyer in the spring of 1948, Hill had made penciled notes of how he wanted to dispose of his property. He then went alone to Mr. Fred Calef, an attorney of his independent choice and who had served him professionally in some past matters.

At this point we summarize Mr. Calef's testimony on the occasion of Hill's call at his office:

"Verd Hill came to the office * * * and wanted to see me about making a new will. I consulted with him at some length. He had a written paper in

which he had listed a lot of items that he wanted in the will, and I spent some time with him discussing these various items   *   *   *.

"*   *   *   *   *

"*   *   * it was a paper written out in longhand in pencil   *   *   *. There were a large number of items, and there must have been several sheets of his notes there   *   *   * and he had various items on his paper and we went through them and discussed them, and then after he left I dictated a draft of the will. I asked him to come back to look over the draft   *   *.   * and he came back   *   *.

"*   *   *   *   *

"*   *   * And he took this draft with him, took it home to study, and he came back several days later —and my recollection is within a week or two he came back   *   *   * I made the draft on yellow paper, and he had made some pencil notations in the margin, and there were various items that he wanted some changes on, and we discussed those and found out what he wanted in the way of changes, and then we discussed the matter of witnesses. * * *"

Mr. Calef was then asked the following question:

"Now, referring to the devising of real property, there are a number of parcels of land that are separately described. Tell whether or not Verd presented those descriptions to you at that time, and the conversation in connection with those."

In response to the subject opened by this query, Mr. Calef gave testimony as follows:

"He had all his property—seemed to have everything very fully in mind. He brought me a description of the home place * * *.

"* * * * *

"* * * He had a written description of that that he had written out in longhand in pencil on a sheet of paper * * * and I checked that through and was

well satisfied with the description he had prepared
himself.

"* * * * *

"* * * He brought quite a few deeds, and par-
ticularly the property that he left for Constance
Henderson. He had several deeds[,] that was in
quite a number of small pieces, and he had the
property marked, and deeds marked just which
pieces would go into that, and I checked it over at
the time and have checked it over since, and he had
done his work accurately, he had lined up several
pieces that all fit together to make one piece; and
the same thing was true there, he gave me the
description and marked it for the other piece there
that went to Ellis Burch."

Decedent's mental grasp of the extent and nature
of his own affairs is further evidenced by three exhibits
in his handwriting found in his deposit box when
opened after his death. One marked "Advice" was
laid with his will and bears the same date as that
instrument. It was apparently made shortly after the
will's execution that day. The subject matter is in the
nature of sound counsel to his executor and trustees
and, among other things, urges them to consult with
each other and "advise and help Esther [his wife]
in her old age in the care of her interest". There are
also suggestions regarding obligations of one of his
renters. The other exhibits are penciled memoranda
made on December 9, 1949, and October 21, 1950,
bearing inventories of his bank deposits, cash and
bonds as of those dates with names of three banks in
which he carried substantial balances. The testimony
of the executrix was to the effect that the various
amounts shown thereby corresponded closely to the
actual amounts at hand at the time of his death.

The provisions of the will itself offer the most

cogent, complete and compelling evidence that Verd Hill had in mind the persons who were, should or might be the natural objects of his bounty. The only "natural objects of his bounty", as heretofore defined, were his wife and his daughter Verda. They were the only persons who could have claimed any interest in his estate had he died intestate. Notwithstanding that the will was a disappointment to them, he, nevertheless, had them both in mind when he named each in separate provisions made in their behalf. All other living beneficiaries were members of his family, nieces and nephews who were children of his deceased brothers and sisters, and a grand niece, the daughter of Constance Henderson. Moreover, bequests made for his wife and daughter were discussed with Mr. Calef, and reasons were given for the size and extent of the provisions made for each. The record leaves no doubt that Verd Hill was cognizant of the scope and reach of the provisions of his last will and testament.

■ The contestant produced Dr. Fratzke, a qualified physician and surgeon, to whom was addressed a hypothetical question concerning the mental competency of the decedent. Verda Hill places great reliance upon that part of this doctor's reply to the effect that such an "individual was probably not cognizant of his responsibility to his family and those that he was going to provide for." We are of the opinion that this testimony elicited from Dr. Fratzke in response to the hypothetical question propounded was not responsive to the question and has no probative value.

■■ The testimony of the subscribing witnesses in support of the mental capacity of the testator is entitled to great weight and is aided by the presumption of competency which follows proof of the will's due

execution. *In re Estate of Andersen,* 192 Or 441, 457, 235 P2d 869; *Trombly et al. v. McKenney, Ex., et al.,* supra, 191 Or 108; *In re Will of Robert Carr,* 121 Or 574, 580, 256 P 390.

Here we find that preparatory to the execution of his will, Verd Hill indulged in the rather unusual and certainly unnecessary legal precaution of having the will's execution witnessed by five persons instead of the required minimum of two. He advised his counsel that he wanted plenty of witnesses so they could prove he was of sound mind and competent to make a will and indicated that he wanted some who were young people. The subscribing witnesses, Lucile Barnhart and Paul Carey, were in that category.

Three of these witnesses testified at the trial. They were Miss Barnhart, a secretary in Mr. Calef's office; Glen C. Smith, postmaster at Independence; and Elmer Addison, a furniture merchant of the same city. With the exception of Miss Barnhart, Verd Hill had known all of them for a considerable length of time. They were unanimous in their opinions that he was of sound mind at the time they witnessed the execution of the will. Mr. Smith and Mr. Addison, who had known him longer, added that he was mentally competent before that date.

The contestant seeks to avoid the effect and value of the testimony of the subscribing witnesses by contending that they failed to make "any inquiry of Mr. Hill on that date seeking to learn whether he knew what he was doing; whether he knew what properties he had, who his heirs were, what disposition he was making of his estate, or how the provisions of the instrument were going to affect his wife and daughter." This contention, it will be observed, is the essence of

the tests laid down in *Re Phillips' Will,* supra, 107 Or 618, for the ultimate determination of the testator's mental capacity. It is a specious argument. There is nothing in the law which mandates that the subscribing witnesses to a will's execution must so catechize the testator as a condition precedent to giving their testimony probative value concerning his state of mind at that time. Indeed, the law protects the privacy of a testator's planned benefactions, if he does not voluntarily take the witnesses into his confidence. It was not necessary that the witnesses have any knowledge concerning the contents of the will, nor was it necessary that the testator should declare the document to be his last will or that the witnesses have any idea of the purport or contents of the instrument to which they had so subscribed. *In re Christofferson's Estate,* 183 Or 75, 82, 190 P2d 928; *In re Davis' Will,* 172 Or 354, 362, 142 P2d 143; *In re Estate of Heaverne,* 118 Or 308, 313, 246 P 720; *In re Estate of Neil,* 111 Or 282, 293, 226 P 439. Their testimony is admissible even if it relates only to the testator's general conduct and state of mind at the moment of his signing, that is, whether or not he then appeared to them to be rational. *Heirs of Clark v. T. A. and J. D. Ellis,* 9 Or 128, 147. The testimony of subscribing witnesses in this respect is valued only because "They have the opportunity to observe the mental condition and all the surrounding circumstances at the time of the execution of the will." *In re Will of Robert Carr,* supra, at page 581. When, however, a subscribing witness can supplement his testimony with evidence falling within the bounds of any of the tests found in *Re Phillips' Will,* supra, then it acquires additional weight; and, of course, unless those tests are met from some creditable testimonial sources, the will must fail.

Two of the will's witnesses enjoyed the additional status of being sufficiently intimate with Verd Hill to warrant a right to express their opinions as to his sanity and give the reasons therefor. *In re Estate of .Riggs*, supra, 120 Or 49; *In re Sturtevant's Estate*, 92 Or 269, 283, 178 P 192, 180 P 595.

There is one further challenge to the mental capacity of Verd Hill that requires some attention. It is the claim of the contestant that her father's niggardly treatment of her was the product of an

### *Insane Delusion.*

In *Potter v. Jones et al.*, 20 Or 239, 248, 25 P 769, 12 LRA 161, it is said (quoting from *Banks v. Goodfellow*, LR 5 QB 560) : " 'When delusions exist which have no foundation in reality and spring only from a diseased and morbid condition of the mind, to that extent the mind must necessarily be taken to be unsound.' " This charge, no doubt, has its principal foundation in Verd Hill's response to his attorney's inquiry concerning the provision of only $1 for his daughter Verda. Asked what was then said by Hill, Mr. Calef replied:

> "He made one comment to me. He said that they had poisoned her mind against him, or her relatives had poisoned her mind against him—I don't recall exactly which way it was said, but I remember the term 'they have poisoned her mind', and he did not go into any further explanation."

■ In *Stevens v. Myers*, 62 Or 372, 382, 121 P 434, 126 P 29, Mr. Justice BURNETT defined an insane delusion as follows:

> "* * * a delusion is the spontaneous product of the subjective processes of a disordered intellect, inducing a belief without any support in extrinsic evidence. On the other hand, if the element of

spontaneity is not present, and there be any extraneous reason, however slight, inducing the conviction in question, and to which a deliberative mind would give attention, there is no delusion. A mere error in judgment upon proven or admitted facts does not constitute a delusion, however much it may be at variance with the conclusion reached by unprejudiced minds from the same facts."

Also see *In re Walther's Estate,* supra, 177 Or 400; *Parrott v. Creson,* 132 Or 234, 240, 285 P 224; *In re Sturtevant's Estate,* supra, at page 279; *In re Diggins' Estate,* 76 Or 341, 345, 149 P 73. In essence, an insane delusion must arise spontaneously and without any extrinsic evidence to support it. Thus tested, the antipathy which Verd Hill entertained for his daughter fails to attain what the law knows as an insane delusion. It was neither spontaneous nor without some evidence to give it support.

This record discloses that Verd Hill and his daughter had no associations, close or otherwise. She was awarded to her mother's custody when Hill was divorced from his first wife in 1921. At that time Verda was three years of age. Although living only five miles apart, they seldom saw each other. After her father and mother were divorced, she lived with her mother and maternal relatives in Albany. Her mother died in 1928, when Verda was about nine years old. She then made her home with her maternal grandmother in Monmouth and thereafter with her aunt, Sarah Smith, a sister of her mother.

As a result of the divorce, quite a bitterness was engendered between Verd Hill and the relatives of his first wife, to the extent that he was not welcome in their homes where his daughter was living. Verda made no effort to heal the breach after she became

older. The relationship with her father became so distant and strained that she no longer considered herself a member of the Hill family.

The decedent's provision for his wife was of greater amplitude than he made for his daughter but perhaps not as generous as a disinterested stranger might feel was warranted. However, Esther Hill was in a position of greater security if displeased with the provision made for her. Article 24 of the will specifically recognizes her right of election. She could repudiate the provisions in her behalf and take a dower interest in all of the real property and claim an undivided one-fourth interest in all personal property of which the decedent died possessed. Ch 475, Oregon Laws 1949. This latter right is "in addition to, and not in lieu of, any right of dower * * * or homestead." Ch 475, § 1, Oregon Laws 1949. The condition of the estate as revealed by the record indicates that the values acquired by such an election would be substantial and possibly in excess of what she, as the widow, would otherwise take under the will.

These are considerations which temper in part the thought that the testator was laboring under any insane delusion in his feelings toward his wife, a claim which is weak at the best. From Esther Hill we learn that when she talked to her husband "lots of times" about making a will, it always prompted a reply from him to her as trying to "feather your little nest, you are looking after your own little neck." Notwithstanding, there is no evidence that he seriously entertained a belief that she was trying to over-enrich herself. It is easy to believe that her frequent mention of the subject to one with Verd Hill's manifestly miserly traits might engender in him a suspicion that she had a too-great personal interest in his estate.

In *In re Walther's Estate,* supra, at page 399, we made reference to certain prior decisions which we feel are equally pertinent here and, therefore, repeat what was there said:

"* * * In the case of In re Cline's Will, 24 Or. 175, 33 P. 542, 41 Am. St. Rep. 851, a testator, by reason of the fact that his children had testified against him and in favor of their mother in a divorce suit, conceived the idea that they did not respect him and were trying to rob him of his property, and so disinherited them. The court held that the facts and circumstances were 'sufficient to support the conclusion he reached, and to establish the belief he possessed', and hence that such belief could not be regarded as an insane delusion. In *In re Sturtevant's Estate,* supra, a father placed his business in the hands of his son, under whose management it declined. This fact, coupled with claims of debtors of the business that they had paid money to the son for which they had not received credit, and other suspicious circumstances, caused the father to feel that the son had embezzled his money. This court said that the father's judgment in the premises might have been too harsh, but that it was not based upon a delusion, for there was some evidence to sustain it. We said, in part:

" 'On this branch of the case it is not for us to say whether in fact the son embezzled the money, but we must say from the record that there is evidence sufficient on that subject, which, presented to the mind of his father, would be a basis upon which the latter could render a judgment—without having a delusion imputed to him—although his decision might in our estimation be a harsh one.' "

In *Parrott v. Creson,* supra, 132 Or 241, another case involving a charge of insane delusion, we held:

"* * * An erroneous or unjust conclusion is not an insane delusion. Neither can a court interfere with the disposition of property under a will merely

because testatrix, on account of bias or prejudice, turns against the natural objects of her bounty. If the belief which was the controlling factor in the making of the will can be upheld upon any hypothesis deducible from the evidence, it is not an insane delusion."

■ We find no evidence of insane delusion and close this phase of our opinion with a statement from Hawkins, Wills 2d ed, 4-5 (1912), which we cited with approval in *Wayne v. Huber,* 134 Or 464, 483, 291 P 356, 294 P 590, 79 ALR 1427:

" 'No man is bound to make a will in such a manner as to deserve approbation from the prudent, the wise, or the good. A testator is permitted to be capricious and improvident, and is, moreover, at liberty to conceal the circumstances and the motives by which he has been actuated in his dispositions. Many a testamentary disposition may seem to the world arbitrary, capricious and eccentric, for which the testator, if he could be heard, might be able to answer most satisfactorily.' "

■ After a careful reading and consideration of all the testimony adduced to sustain the contention of mental incapacity, we are compelled to hold that Verd Hill was mentally competent when he executed the will of May 14, 1948.

We will now give consideration to the charge of

*Undue Influence.*

In her petition the contestant alleges:

" '* * * that at the date of said instrument, and thereafter and for a long time prior thereto, the said Constance J. Henderson, by design and by the exercise of artifice and by devious and crafty means and methods, wrought her persuasive and constraining influence upon the mental weaknesses of said Verd Hill and skillfully practiced upon him her

dominion and control to such extent that in his state of mental infirmity he was incapable of resisting her said influence and coercing methods, and as the result thereof he was incapable of knowing or realizing the consequences of his signing his said purported will, and for the reasons alleged said instrument is not the free and unconstrained product of a sound mind.''

Verda Hill asserts that this is evidenced and supported by facts and circumstances which we will later discuss with greater particularity but now generalize as follows:

1. The presence of Verd Hill and Constance Henderson in the company of each other on numerous occasions with many ''secret'' meetings together.

2. A certain trip which Verd Hill and Constance made to San Francisco in 1940 to see the world's fair in that city.

3. An incident occurring in June 1949, with reference to Verd Hill's going to a class reunion at Oregon State College.

4. What contestant claims was Constance's evident knowledge of the contents of the will prior to testator's death.

5. A certain writing which was supposed to have been existent in 1938 and which Constance is said to have inadvertently dropped in her uncle's living room.

Concerning these things, the contestant in her brief makes this noteworthy concession:

''Appellant concedes that she would have the burden of proving the will was the product of undue influence, if that were the sole basis for the contest, before she could prevail upon the appeal. Such preponderance of evidence is not possible in this case. * * *''

In so saying she not only gives cognizance to well-established rules of law but attempts to escape the burden which they impose when she admits she cannot adduce a necessary preponderance of evidence but hopes, however, to attain that desired result by shifting it to Constance Henderson as the will's proponent. This she can only accomplish, and seeks to accomplish, by proving, first, that a confidential relationship existed between Constance and her uncle and, second, that Constance actively participated in the will's preparation.

The burden of proof of undue influence is ordinarily upon the party who asserts it and never shifts, but there may be circumstances when it is cast upon a beneficiary. Such is the rule when there is proof of the existence of a confidential relationship between the testator and the beneficiary, coupled with proof that the beneficiary actively participated in the will's preparation. Evident activity of that character casts upon the latter the burden of disproving undue influence. *In re Estate of Urich,* 194 Or 429, 445, 242 P2d 204; *Detsch v. Detsch, Administratrix,* supra, 191 Or 165; *Trombly et al. v. McKenney, Ex., et al.,* supra, 191 Or 108; *Allen v. Breding,* supra, 181 Or 341; *In re Southman's Estate,* 178 Or 462, 482, 168 P2d 572; *In re Brown's Estate,* 165 Or 575, 584, 108 P2d 775.

As was well put by Mr. Justice MOORE in *In re Darst's Will,* 34 Or 58, 65, 54 P 947:

"Influence arising from gratitude, affection, or esteem is not undue, nor can it become such unless it destroys the free agency of the testator at the time the instrument is executed, and shows that the disposition which he attempted to make of his property therein results from the fraud, imposition, and restraint of the person whose superior will

prompts the execution of the testament in the particular manner which the testator adopts * * *."

Also see *Evans et al. v. Anderson,* 186 Or 443, 470, 207 P2d 165; *In re Will of Robert Carr,* supra, 121 Or 582; *Turner's Will,* 51 Or 1, 8, 93 P 461.

Inasmuch as the claim of confidential relationship and the exercise of undue influence spring from substantially the same background of facts, we will pause here to review and summarize the record bearing upon the history of the decedent and proponent insofar as it touches their mutual relations. In so doing we will stress the items upon which Verda Hill rests this phase of her case.

Earlier in this opinion we have referred to the years of Constance's residence in the home of her uncle and her childhood interest in following him as he did his work on the farm. From the record here it appears to us that this relationship was never more than an intimate and friendly companionship which subsisted between the uncle and his niece, the daughter of his favorite sister, which continued to manifest itself in the same manner whenever Constance in her later life would visit her uncle's home. Indeed, we find that on the occasions of such visits to his home place when accompanied by her child, the three would retrace the scenes of her childhood days and ways. These visitations to the places of her early interest are converted by the proponent into "secret meetings" and are claimed to have been a part of Constance's carefully executed "secret campaign". They rest solely upon the testimony of Esther Hill, the disappointed widow of Verd Hill, and are found comprehended in testimony reading as follows:

"Q Now, this—Before we get to that—In the

meantime, now, what did you observe around the house and place there as to Constance and Verd being on good terms or otherwise?

"A Oh, they were always on friendly terms, very friendly terms.

"Q Well, what did you observe in their actions?

"A Well, when she used to come to visit, they always had their little secret talks and they—sometimes it seemed as though there was a code between them.

"Q That is your conclusion?

"A The facts I don't know. He used to say, Constance, have you ever seen this or that or something or other, then she would say, No, that would be very interesting.

"Q Then what?

"A Then they would go out to see whatever it was.

"Q Where would they go?

"A Sometimes out to the granary, or—

"Q In their conversation, did they indicate where this something was?

"A Out toward the barn, out toward the granary.

"Q In all those instances did they actually go to the place that had been indicated?

"A Well, I thought they did. I suppose they did. I did not pay much attention to it.

"Q Did you observe them outside?

"A I did one time. One time I went upstairs and I looked out the window and saw them out by the barn talking, but what they were talking I could not hear.

"Q What about their conversation did impress you? Was it long distance across the barnyard, shouting?

"A No, they were standing very close together, talking very intimate.

"* * * * *

"Q Now, do you remember times when Constance was there and Verd would come in from his

work in his work clothes and so forth. Did anything take place between them?

"A Well, she always thought he ought to take better care of himself, that he should be working with clothes not to get a cold.

"Q Did she make any forward action toward him? Did she approach him in any close-up?

"A Oh no, no, not that way, but it just showed she was very much interested in him and his health and so forth.

"Q Did you ever see them when they left the house together in the pick-up in wet or stormy weather?

"A Yes, at one time they went away in a terrible storm one day. Why anybody would want to go—She put on her husband's coverall at that time. The top leaked like a sieve— at that time he had not got that other roof on, and it was a terrible storm, and she took the little girl and went with him to look at the sheep. * * *

"Q * * * How long were they gone?

"A Oh, a couple of hours. An hour and a half or two hours. I would not know the time."

We think evidence of this character is entirely too flimsy and tenuous to warrant a conclusion that these visitations which Constance had with her uncle were clandestine in character or fraudulent in purpose. Kind treatment and even reasonable solicitation do not constitute undue influence (*In re Sturtevant's Estate,* supra, 92 Or 300) nor do gratitude, affection or esteem, unless they were so powerful as to destroy the free agency of the testator at the time of the execution of the will. *Allen v. Breding,* supra, 181 Or 343.

The circumstances and the time attending the making of the will tend to negative the force of the influence springing from these natural associations, if, indeed, any undue influence can be justly said to have been conjured thereby. These pastoral associations, like so

much of what Verda Hill relies upon to prove the existence of a sinister purpose on the part of her cousin, do not transcend the level of mere suspicion. Suspicion is not a substitute for such proof of undue influence. *Trombly et al. v. McKenney, Ex., et al.,* supra, 191 Or 111; *Detsch v. Detsch, Administratrix,* supra, 191 Or 169; *In re Will of Robert Carr,* supra, 121 Or 581; *Rice v. Rice,* 95 Or 559, 563, 188 P 181.

With the help of Constance's aunt, a sister of her deceased father, she was able to continue her education and entered Oregon State College at Corvallis in the fall of 1938. During the period of her scholastic residence there, she spent many week ends and college vacations at the Hill home. It was in this period, in September 1940, while she was visiting at the home of relatives in Spokane, that she received a call from her Uncle Verd inviting her to join him and at his expense visit the San Francisco exposition of that year. The proponent, then a young lady of about 21, accepted the invitation of her uncle, then about 64. They were away about one week, three days of which were spent at the fair and the remaining time visiting mutual California relatives living in and about the Bay region. Mrs. Hill at the time was visiting relatives in Iowa. It is Verd Hill's wife who attempts to capitalize on this California trip. Her chief complaint concerning it is her claim that she had earlier expressed a desire to go but that Mr. Hill had declined to take her. Fairness dictates the observation that one has had the temerity to suggest that any meretricious relationship subsisted between the uncle and the niece in their associations. The evidence concerning the San Francisco trip does not give rise to even a slight suspicion that it was provocative of any kind of evil influence over Verd Hill on the part of his niece. Moreover, this California

excursion happened nearly eight years prior to the making of the challenged will.

Shortly after Constance was in San Francisco with her uncle, there happened an event which marked the beginning of a new era in her life and a lessened opportunity for seeing her uncle. She was married in April 1941. Her husband being in the army, they lived in various places during the years of his military service. We find her moving with him to Tacoma, Washington; Pendleton, Oregon; Fresno, California; and Salem, Oregon. A baby girl was born to the Hendersons during this time. Just how long this migratory life continued for them is not disclosed, although it appears that sometime after the termination of Mr. Henderson's military career, they settled in Corvallis. This, however, was before March 1947, when they again went to live in Fresno.

During the residence of the Hendersons in Corvallis and, as we read the record, both before 1947 and after they returned to that city in April 1949, Constance would visit the Hill family in Independence and would sometimes spend week ends with them, accompanied by her daughter. The nature of her conversations with her uncle at those times is reflected by her testimony as follows:

"Q On these occasions when you would visit with Verd Hill, what would be the subject matter of your visits?

"A Oh, just topics of the time, current events, and war, and I always liked to hear him talk about history and we talked about that, and I always liked geography and he did, too, and we still talked a lot about geography and travel; and I always felt he was the one person I could go to for advice, so I asked him quite a few questions and sought his advice on personal matters, like, well, buying a place

in Corvallis and wondering whether the land was good—he knew the lay of the land pretty well all over the Willamette Valley.

"Q Did you ever discuss with him what he was going to do with his property when he died?

"A No, never.

"Q Did you ever say anything to him about who he would leave his property to, whether he would make a will or not?

"A No, he was not the kind of person you ask those things of."

While in Fresno during the 1947–1949 period of their residence there, both Constance and her husband were employed. It was during this time that Verd Hill executed his contested will. During that absence, she made one vacation trip to Oregon. That was in October 1948, substantially five months after the will was drawn and executed. Whatever was learned by Constance concerning the contents of that will was learned on the occasion of that visit. We have only her testimony of what was said by her uncle at that time concerning his will already made. She testified:

"Q Did you have any conversation with your Uncle Verd respecting his will or estate during that visit in October 1948?

"A Yes, he said—we had been out to look at the new railroad, Garlin [her daughter] and I and Uncle Verd—and he said, businesslike, Constance I have made a will and named you administratrix of the will, and I have left the Kibbey orchard to you, and Uncle Dewey's place to you, I know you won't cut the trees off them will you, you will save them. And I said, Oh yes I would like them but I don't feel I would make a good administratrix at all and I thought Wendell [nephew of testator] would make a better one, and he started to go on about it, and I told him he was not going to die for a long time, and I didn't go on and say it but I felt there

had been too many deaths in the family already, and I did not want to talk about it.

"Q Was anything else ever said about a will or his property or his dying, at any other time?

"A No, that was the only mention he ever made of it or I did."

Esther Hill furnished the only other testimony concerning the extent of Constance's knowledge of the will's contents. It relates to a conversation had after Verd Hill's death. On her direct examination she testified:

"Q Did she express any surprise at being appointed [executrix]?

"A Yes, she did. On the day—Wendell was with her the day, and she acted surprised, and I said, Constance you are not surprised, haven't you and Verd talked these things before?

"Q And her answer?

"A Well yes, she says, he has mentioned it; and I says, I thought he had because you have had lots of talks.

"Q State whether or not she made a definite statement that she and Verd had talked over this will of his a number of times?

"A She said he had mentioned it. Those were her words."

█ The record referred to does not warrant a conclusion that Constance Henderson was fully conversant with the terms of her uncle's will after he made it nor, even if we assume to the contrary that she was so informed, does it evidence the exercise of undue influence in producing the provisions favorable to her. The disclosure to a beneficiary of a will's provisions in whole or in part is neither a novel procedure nor does it, in and of itself, indict the good faith of the beneficiary who listens to the recitals of its contents.

The contestant lays the charge that Constance, after her uncle's death, "was actively present in all matters pertaining to obtaining the will and handling the estate" and complains that she, as testator's daughter, "was not invited to attend at opening the safe deposit box at the bank or in examining the will." Just what Verda Hill claims for these matters is not clear. Obviously, they are frivolous and immaterial as proof of undue influence. The activity of proponent first referred to is consonant with her duty as executrix of her uncle's estate. The opening of a safe-deposit box to obtain a decedent's will is not a family ceremony requiring the presence of any of the testator's kin. Constance alone, after her uncle's death, was the legal custodian of the keys to the box and necessarily had to be present when it was opened for the inspection of its contents by the state treasurer. § 20-122, OCLA. The "reading of the will" by the decedent's lawyer in the presence of the assembled members of a family is a relic of picture and story but one not mandated by law nor by current social customs.

The incident of June 1949 relates to an invitation extended by Constance to Verd Hill and his wife to attend a homecoming and reunion of Mr. Hill's class on the campus of Oregon State College. When she called to take them, it is Verda Hill's contention, Constance "put on such an act and display of temper and ill will" that Mrs. Hill declined to accompany them. Our examination of the testimony on this point, particularly the version given by Mrs. Hill, warrants no such conclusion that any influence or pressure was brought to bear upon Verd Hill to compel him to do anything. It is more revealing of Esther Hill's pique and supersensitiveness. In no way can it be successfully invoked in aid of the contestant's case.

We now refer to the last of those incidents or occasions by which the contestant seeks to bolster her claim of undue influence. It relates to the note or writing made in 1938. At the time of this alleged happening, Constance was about 19 years of age, a student at Monmouth normal school and a resident in the Hill home. According to Mrs. Hill, she and her husband were engaging in a dispute in the living room. Constance was present, working on her school studies, but during the argument she retired to the privacy of her own room, taking her school books with her. Mrs. Hill testifies that she later found on the floor, near where Constance was sitting, a note in the proponent's handwriting. The paper was not produced at the trial and Mrs. Hill's memory of its contents, orally supplied 13 years after she first found it, is that it read as follows: "Its too bad Esther is here, if anything should happen to Uncle Verd she and Verda would get all he had if he has not made other preparations, if he had not fixed it someway." Thereafter, says Esther Hill, she secreted the writing in a chest containing her private belongings and where she claimed it remained until she first discovered its absence in the fall of 1940. Constance emphatically denies any recollection of the incident or any knowledge of a writing of that character.

Concerning the 1938 incident relating to the note, the trip to San Francisco in 1940, the alleged secret meetings between Constance and her uncle, the trip to Corvallis in 1949, and the claim of the proponent's evident knowledge of the will's contents, Verda Hill relies exclusively upon the testimony of Esther Hill, her stepmother. Mrs. Hill, as the widow, is obviously a bitterly disappointed beneficiary. With her disappointment we can sympathize but find ourselves unimpressed by her testimony concerning the matters

alluded to and upon which Verda Hill rests her case for undue influence. Esther Hill is neither convincing nor certain in her testimony. Any lingering doubt as to the relative value of the testimony of Esther Hill and Constance Henderson is resolved in favor of the latter by the action of the lower court. He saw and heard both witnesses. They were diametrically opposed in their versions of the various occasions from whence Verda Hill seeks to cull proof favorable to her cause. We defer to the lower court's conclusion made at a time and in an atmosphere tending to a more accurate result than we can hope to attain here from a reading of a cold record.

The record does not support the charge of undue influence, thus rendering it unnecessary to pass upon the question of whether or not Constance Henderson enjoyed a confidential relationship with her uncle, as that relationship is defined by *In re Knutson's Will,* 149 Or 467, 488, 41 P2d 793.

Even though it be conceded that the beneficiary, Constance Henderson, by reason of a confidential relationship prevailing between her and her uncle, was at times in a position of persuasive influence, it does not follow, and the law does not hold, that the power or influence springing from such a relationship was ipso facto wrongly employed by her to compel or induce her uncle to make testamentary provisions favorable to her and contrary to what would have resulted from an exercise of the testator's free will and volition. *Detsch v. Detsch, Administratrix,* supra, 191 Or 165; *Turner's Will,* supra, 51 Or 8; 68 CJ, Wills, 758, § 451.

■ The malignant influence contemplated as being of sufficient force to invalidate a will is that which was the efficient cause of the challenged benefaction and without which the will would never have been made.

*In re Lobb's Will,* 177 Or 162, 185, 160 P2d 295. We have held that motive and opportunity are not enough. More is required. There must be proof that undue influence was actually exercised. *In re Estate of Andersen,* supra, 192 Or 461; *In re Will of Robert Carr,* supra, 121 Or 581.

It is well settled that undue influence must operate at the very time the will is executed. *In re Southman's Estate,* supra, 178 Or 482. In no respect does the testimony adduced by the contestant even remotely suggest that the alleged evil influence of the proponent was in operation at the time Verd Hill executed his will in May 1948. Constance Henderson was then living in California and had been a resident there since April 1947. It was not until October 1948 that she next saw her uncle. Two letters written by him to her during that period are in evidence. They are purely family in character, that is, recounting the condition of health of their Oregon relatives and making inquiry concerning the Henderson family, with comments about the weather. Nothing is hinted thereby that he planned to make a will or even solicited Constance's advice concerning that subject or any other matters relating to his business. Much is in the record concerning matters transpiring years before the signing of the will and much after, but there is nothing to support the presence of a malign influence at the time it was executed.

In *In re Will of Pittock,* 102 Or 159, 174, 199 P 633, 202 P 216, 17 ALR 218, we held:

> "* * * it is not enough to show that the defendant had an opportunity to exercise such influence, but it must also appear that the influence was actually exercised, and not only so, but that it was

pushed to such an extent that the resultant will was not that of the testator but that of the parties procuring its execution * * *."

We find no merit in the charge of undue influence.

One who ventures to attack the validity of a will assumes a heavy legal and moral responsibility. The pertinent rules of law are exacting and unyielding. The evidence required to insure success almost invariably tends to discredit the reputation of the deceased and depreciates him in the affection of relatives and friends who, in ignorance of the disclosures compelled by such a contest, had theretofore thought of him in terms of respect and esteem. One who has a clearly righteous and just cause need not flinch from this responsibility, but one on less sure ground should long hesitate to speculate on the result before bringing his ancestor's name under the possible shadow of obliquity and exposing it to conceivable contempt and ridicule. It is one of the anomalies of the law that he who would profit more generously in a testator's estate must show that the decedent, through whom self-enrichment is sought, was mentally incompetent or too weak in will or character to resist the furtive and malevolent influences of some other person. Win or lose, family skeletons must be unabashedly brought forth from their secret closets for intimate exposure and the inspection of all who may be curious. Even though a court may find the charges untrue, as here, there still may linger a shadow of uncertainty as to the mentality of some previously esteemed person who may thereafter be remembered as weak instead of strong in character or in mind, with consequent embarrassment and heartache for those who had cherished his memory.

The lower court is affirmed.