Argued February 4, affirmed as modified July 1, petition
for rehearing denied July 29, 1959

IN THE MATTER OF THE ESTATE OF
JENNIE M. SESSIONS, DECEASED
DEAN ET AL *v.* FIRST NATIONAL BANK ET AL

341 P. 2d 512

*Jack L. Kennedy*, Portland, argued the cause for appellants. On the briefs were Krause, Evans & Lindsay, Walter H. Evans, Jr., and Jack L. Kennedy, Portland.

*Carl M. Brophy*, Medford, argued the cause for respondents First National Bank of Portland (Oregon), William Michael Tuffs, a minor, and William Sherman Tuffs. On the briefs were Duncan, Brophy, Wilson & Duhaime, Medford.

Before ROSSMAN, Presiding Justice, and LUSK, WARNER, PERRY, SLOAN and O'CONNELL, Justices.

WARNER, J.

This is an appeal in a will contest. The contestants Dean and Ross seek to have an order admitting the will of Jennie M. Sessions, deceased, executed August 2, 1950, vacated and have a will executed by her on August 25, 1949, probated in lieu thereof. From an adverse judgment, the contestants alone appeal.

Mrs. Sessions died on March 13, 1951, being then approximately 92 years of age. She left no children or lineal descendants surviving. Her heirs at law and next of kin are four nephews and two nieces, two grand-nephews and a grandniece. The contestant Charles F.

Dean, a son of Mrs. Sessions' deceased sister, Lydia Tuffs Dean, is one of decedent's four nephews. All of her other heirs are parties defendant. The complaint describes the contestant S. L. Ross[1] as an assignee of such interest as Charles F. Dean might have under the will of 1949.

We find it unnecessary to make further mention of the several parties and their relationship to Mrs. Sessions except those having a particular interest by reason of her will of 1950 because of Mrs. Sessions' exercise of the power of appointment conferred by the will of her brother, James T. Tuffs.

The defendant First National Bank of Portland (Oregon) is impleaded individually, as executor of Mrs. Sessions' will of 1950, and the executor named in her will of 1949, and as trustee under the will of James T. Tuffs, deceased, who died in 1947.

The defendant William Grant Tuffs is a son of James T. Tuffs, deceased, and the defendant William Sherman Tuffs is a son of said William Grant Tuffs and grandnephew of Mrs. Sessions. The defendant William Michael Tuffs, born January 12, 1950, is the minor son of William Sherman Tuffs and great-grandnephew of Mrs. Sessions. We will hereinafter refer to him as Michael.

Mrs. Sessions' sister, Minnie L. Tuffs, died in 1949 without leaving children surviving.

The will of James T. Tuffs created three trusts: one for each of his two surviving sons; that is, the defendant William Grant Tuffs and James H. Tuffs, now deceased, and one for the use and benefit of his two surviving sisters, Minnie L. Tuffs and Jennie M. Ses-

---

[1] The contestant S. L. Ross is the wife of Charles F. Dean. Her true name is Sue L. Ross Dean. She testified that she uses S. L. Ross or Sue L. Ross because of certain business activities in which she is engaged.

sions. The First National Bank of Portland was nominated and functioned as the trustee of this trust for the sisters.

Upon Minnie L. Tuffs' death, the power to appoint the beneficiaries to that trust on its termination vested in the surviving sister, Jennie M. Sessions.

Referring back to the two trusts created for the sons of James T. Tuffs, it appears that his will further provided that upon the death of either son, the trust created for his benefit should be distributed to the trust created for the testator's sisters, or, in the event of their prior death, to the trust for testator's surviving son. By reason thereof, the corpus of the trust established for his son James H. Tuffs, upon the latter's death, became a part of the trust established for Mrs. Sessions and her sister, Minnie.

We will later turn to the 1950 will of Mrs. Sessions to discover how she employed the power of appointment conferred upon her by the will of her brother, James T. Tuffs.

The appeal of the contestants presents the following questions for our consideration:

1. Was the will of 1950 executed by Mrs. Sessions the result of undue influence and misrepresentation which should bar its probate?

2. Did her exercise of the power of appointment derived through the will of her brother, James T. Tuffs, violate the Rule Against Perpetuities?

3. In naming William Michael Tuffs in the trust which Mrs. Sessions created for his use and benefit, did she violate the express terms and conditions of the power of appointment received through the will of her brother?

The answer to the first question manifestly raises

one of fact, whereas the last two involve questions of law.

An additional issue is raised by the defendants-respondents' challenge to the court's jurisdiction to receive and consider the petition of the contestants. We will give it our first attention.

## CHALLENGE TO JURISDICTION

The 1950 will of Mrs. Sessions was admitted to probate on April 2, 1951. On September 26, 1951, the contestants filed their petition. This was verified by petitioner Charles F. Dean. The petition, however, alleged that Dean had assigned his interest in the Sessions estate to the other contestant, S. L. Ross, and who is, as we have noticed, the assignor's wife. Defendants on November 10, 1951, moved to strike the petition for want of a vertification by a "party in interest." ORS 115.180.[2] On November fifteenth, and before the court ruled on the motion, the contestant Ross verified the petition by means of a supplemental verification. Later, the court denied the motion to strike. On April 7, 1953, the defendants demurred on the grounds inter alia "that said contest was not commenced within the time limited by [ORS 115.180, supra]." The demurrer being overruled, is renewed here.

We are of the opinion that the execution of the verification to the petition by the contestant Dean, was nothing more than an irregularity, duly corrected by the supplemental vertification made by the contestant

[2] ORS 115.180: "(1) When a will has been admitted to probate, any person interested may, at any time within six months after the date of the entry in the court journal of the order of court admitting such will to probate, contest the same or the validity of such will; but, if a person entitled to contest the probate of a will or the validity thereof is laboring under any legal disability, the time in which he may institute such contest shall be extended six months from and after the removal of such disability.

"(2) Any will made pursuant to ORS 114.060 may be contested and annulled within the same time and in the same manner as wills executed and proven in this state."

Ross, and which at no time impaired the jurisdiction of the court.

We have before said that a verification is merely a formal matter and described a want of a proper verification as a mere irregularity. *State v. Chadwick and Brown,* 10 Or 423, 427; *German Loan Society v. Kern,* 38 Or 232, 237, 62 P 788, 63 P 1052; *Columbia Auto Works v. Yates,* 176 Or 295, 312, 156 P2d 561. We have also held that the allowance of an amendment to an imperfect verification rests in the sound discretion of the trial court and its action is not a subject for review on appeal. *Blanchard v. Bennett,* 1 Or 329, 330; *Clark v. Clark,* 81 Or 405, 407, 159 P 969. See, also, 71 CJS 760, Pleading § 358.

The verification of a complaint speaks as of the time when the action was commenced by filing the complaint or petition and is sufficient if it was then true. *Gilbert v. Branchflower,* 114 Or 508, 519, 231 P 982; *Pulliam v. Pulliam,* 163 Kan 497, 183 P2d 220, 1 ALR2d 418, 421; 71 CJS 760, supra; 41 Am Jur 486, Pleading § 285 (1958 Cum Sup p 65). An imperfect verification being only irregular and subject to being cured by amendment, the amendment relates back to the original verification. *Cheyenne County Com'rs v. Walter,* 83 Kan 743, 112 P 599, 600; *Pulliam v. Pulliam,* supra; *Ruggles v. Smith,* 175 Kan 76, 259 P2d 199, 202 (1953); *Greene v. Union Pacific Stages, Inc.,* 182 Wash 143, 145, 45 P2d 611, 612 (1935); 1 Bancroft, Code Pleading Practice and Remedies (10 yr Sup 1936), 251 § 500. Cf. *Ross v. Robinson,* 174 Or 25, 30, 147 P2d 204; *Ibach v. Jackson,* 148 Or 92, 101, 35 P2d 672; *Railton v. Redmar,* 209 Or 80, 85, 304 P2d 408.

The jurisdictional power of the court to act in the premises is determined in the first instance from an

examination of the complaint or petition to discover whether it avers facts sufficient to invoke an exercise of jurisdiction of the court so as to authorize it to grant the prayer of the petition. *Dippold v. Cathlamet Timber Co.*, 98 Or 183, 189, 193 P 909; *E. Henry Wemme Co. v. Selling*, 123 Or 406, 416, 417, 262 P 833; *McDonough v. Southern Or. Mining Co.*, 177 Or 136, 149, 159 P2d 829, 161 P2d 786. Cf. *Wright and Jones v. Edwards*, 10 Or 298, 303, et seq. But the verification does not constitute any part of the pleadings and cannot render it defective. 1 Bancroft, Code Pleading, 716 § 500. It adds no allegation. It tenders no issue. It is, as we have said, a formal matter, the omission or imperfection of which does not rise above the status of a mere irregularity that may be waived or cured by amendment. Its defects do not vitiate jurisdiction. *In Re Sullivan's Estate*, 40 Wash 202, 82 P 297, 299; *Workman v. Workman*, 113 Ind App 245, 46 NE2d 718, 724 (1934).

■ Holding as we do that defendants' contention that the court was without jurisdiction is untenable, we now give attention to the contestants' several assignments of error.

### CHARGE OF UNDUE INFLUENCE

The contestants' first proposition charges that Mrs. Sessions in making her will of 1950 was subjected to undue influence.

It is claimed by the contestants that a beneficial interest accrued to the bank by reason of its nomination as trustee for the trust created for the minor, William Michael Tuffs.

■ Every will is the product of some kind of influence. *In re Kelly's Estate*, 150 Or 598, 617, 46 P2d 84. But the undue influences against which the law in-

veighs are the improper influences to control the disposition of one's property. It is not a term which can be specifically defined. *In re Reddaway's Estate,* 214 Or 410, 329 P2d 886, 889 (1958). The charge, when advanced, as here, poses the question: "* * * has the influencer by his conduct gained an unfair advantage by devices which reasonable men regard as improper?" (329 P2d, supra, at 890)

■ The burden of proof of undue influence is ordinarily cast upon the party who asserts it. *In re Estate of Verd Hill,* 198 Or 307, 334, 256 P2d 735. However, when there is proof of the existence of a confidential relationship, which, taken in connection with other suspicious circumstances, may justify a suspicion of undue influence, the beneficiary may be required to go forward with the proof and present evidence sufficient to overcome the adverse influence. *In re Southman's Estate,* 178 Or 462, 482, 168 P2d 572. But, as emphasized in *Reddaway's Estate,* supra: "It will be noted that the burden [on the beneficiaries] does not exist unless there are circumstances in addition to the confidential relation." (329 P2d, supra, at 891)

Contestants mistakenly seek to invoke the foregoing rule here. But, notwithstanding the presence of a confidential relationship, we find the record to be devoid of any suspicious circumstances which cast upon any of the beneficiaries a burden to overcome.

The testamentary capacity of the testatrix stands unchallenged. The record supports the finding of the trial court that her capacity to make a valid testament was unimpaired at the time of executing her will of 1950. There can be no doubt that she was in full possession of memory and powers of comprehension and knew exactly what she was doing at that time. Indeed,

we are impelled to conclude that for a woman of her advanced years, Mrs. Sessions' mental and physical status were little short of remarkable. Her letters, her conversations and her activities within the home and in her garden give eloquent support to this judgment. They justify the observations of disinterested witnesses that she was "a very strong, determined, positive woman" and had a very good mind and memory.

The contestants' charge of "undue influence" is one of implication only, and derived primarily from the fact that Tracy Crum, a trust officer of The First National Bank of Portland, enjoyed a friendly and confidential relationship with the decedent. At Mrs. Sessions' request, and sometime near July 15, 1950, Crum called Mr. Balderree, an attorney of Grants Pass, to advise him that Mrs. Sessions desired to discuss her will with him. Mr. Balderree understood this to mean the then existing will of 1949. At this juncture, we witness Mr. Crum's departure from the scene.

On July 15, 1950, in response to Crum's call, and again on July 31, 1950, in response to the call of Mrs. Sessions' housekeeper, Balderree visited Mrs. Sessions in her home. No one else was present, nor was Crum mentioned on either occasion. She desired changes in her estate plan and gave reasons therefor, the foremost being her intense concern for the welfare of Michael Tuffs, and whose parents were young persons of very modest means. In fact, these thoughts prompted her to initiate the discussion concerning her will when Balderree visited her on the first occasion. On August 2, 1950, the instant will was signed by the decedent and under circumstances in conformity with the highest standards and methods espoused by the legal profession.

The transcript and exhibits are replete with un-

mistakable signs portraying Mrs. Sessions' deep and continuing interest for the boy. It continued to her death. Her kinship and love for Michael appear to be the sole moving force behind her action. Neither William Sherman Tuffs, the boy's father, nor Mr. Crum knew of her testamentary plan for Michael and William Sherman Tuffs, as a contingent beneficiary, until the will was read for the first time after her death.

■ Under these circumstances, we cannot say that the bequest given the boy, William Michael Tuffs, was unnatural or unjust. See *In re Estate of Verd Hill,* supra (198 Or at 315); *In re Walther's Estate,* 177 Or 382, 397, 163 P2d 285 (1945), citing cases. Our perusal of the record accords with the views of the lower court which had the opportunity to witness the reception of testimony. It is a record which will not permit us to indulge in the imputation of undue influence upon the part of anyone. Contestants have not met the burden of proof required.

■ A confidential relation existing between the testator and a beneficiary under a will, or the opportunity to exercise undue influence, is not enough to avoid a will. *Turner's Will,* 51 Or 1, 93 P 461; *In re Knutson's Will,* 149 Or 467, 487, 41 P2d 793.

■ The argument of contestants seems to rest on the premise that because Mr. Crum was employed by the bank as a trust officer he necessarily labored solely in the interest of his employer to directly or indirectly induce Mrs. Sessions to create a trust for Michael that the bank might administer the same to its profit. The implication is that he did so to the exclusion of the force of what might have been Mrs. Sessions' independent judgment to the contrary. Such a premise is a false one. It assumes that if one mentally competent,

as was Mrs. Sessions, has conversation with a bank officer concerning one's will, that his or her later action must have been solely dictated by that officer's recommendations if such bank is named as a trustee or executor therein. It is a conclusion which overlooks that the testator may have independently arrived at the same conclusion by reason of her own observations or other investigation. Such we think is shown by the record here.

We deem it not strange that Mrs. Sessions turned voluntarily to the bank she nominated to render a trust service in behalf of her great-grandnephew. She had had rare and intimate opportunities to witness the manner in which the bank of her choice had exercised functions as an executor and a trustee. It had stood in those capacities under the will of her brother, James T. Tuffs, who died July 14, 1947. Both Mrs. Sessions and her sister, Minnie, who resided with her, were the sole beneficiaries under the largest testamentary trust created by Mr. Tuffs.

Mrs. Sessions had also had an opportunity to observe the bank's performance as conservator of the estate of her sister, Minnie, following its court appointment to that office after her brother's death.

Again, she was brought in continuing contact with the bank as the executor and trustee under her sister Minnie's will and wherein Mrs. Sessions was a beneficiary.

That her confidence in the bank as a competent trustee was, therefore, one of long standing prior to the execution of her will of 1950 is attested by the provision in her will of 1949, wherein it was named as executor. It is this will of 1949 that the contestants sought to have probated in lieu of the will of 1950.

Here, the bank's sole participation in the prepara-

tion of the will of 1950 is found only in Mr. Crum's call to Mr. Balderree on the fifteenth of July, 1950. We find nothing which remotely conveys a thought that Mr. Crum attempted to suggest what the will should contain. The record stands uncontroverted that Mr. Crum knew nothing concerning the contents of the will of 1950 until, as we have said, it was first read after Mrs. Sessions' death.

Nor is it unusual that Mrs. Sessions desired to have Mr. Balderree's advice. He was not a stranger to her. It was he who drew her will in 1949.

The meticulous care which Mr. Balderree gave to his responsibility is deserving of highest commendation. At all times he was vigilant to assure himself that Mrs. Sessions was acting in response to her own judgment and wishes and clearly understood the legal significance of what she was doing.

It is clear to us that Mrs. Sessions received independent and disinterested advice. *Toomey v. Moore*, 213 Or 422, 431, 325 P2d 805 (1958). We are convinced that the pattern of the will reflected her own ideas long considered and formulated in an atmosphere free from the influence of any person. It was her considered opinion that Michael's tender years dictated that until his arrival at the age of 25, his interest in the large trust estate created should be administered and conserved with prudence by one of large financial experience.

We find that contestants' first assignment of error is wanting in merit.

*RE: THE RULE AGAINST PERPETUITIES*

The second and third propositions of contestants have their roots in the provisions of the trust clause of Mrs. Sessions' will for the use and benefit of Michael,

with their arguments limited primarily to a consideration of principles of law.

The second proposition represents that in the exercise of the testamentary power of appoinment conferred on her by the last will of James T. Tuffs, Mrs. Sessions' provision for Michael violates the Rule Against Perpetuities, and, as a result, the will is void and of no effect.

Turning to the 1950 will of Mrs. Sessions, we find in its Fourth article the creation of the testamentary trust for Michael which, as far as pertinent, reads:

"* * * My sister, Minnie Tuffs, having predeceased me, it is my understanding that I have the power to dispose of said property. The principal and interest of said trust and all other property of which I have the power of appointment under the Will of my deceased brother, James T. Tuffs, deceased, I give, devise and bequeath to The First National Bank of Portland (Oregon), a national banking association, in trust, however, upon the terms and conditions and for the uses and purposes hereinafter provided:

"1. Until William Michael Tuffs, now of Smith River, California, a son of William Sherman Tuffs, also of Smith River, California, shall attain the age of twenty-five (25) years, I direct my Trustee to pay to William Sherman Tuffs, father of William Michael Tuffs, for the benefit of said William Michael Tuffs, so much of the net income of the trust estate and such sums from the principal as my Trustee shall deem necessary or advisable in its sole discretion for the care, support, maintenance and education of the said William Michael Tuffs. My Trustee is expressly authorized to make said payments to the said William Sherman Tuffs for the benefit of William Michael Tuffs without his appointment as formal guardian or otherwise and without regard to his residence or the residence of William Michael Tuffs.

"2. My Trustee may at any time pay to William Sherman Tuffs or apply for the benefit of William Michael Tuffs such sums as it may in its discretion deem necessary in the event of William Michael Tuffs' illness, accident or other emergency.

"3. When the said William Michael Tuffs shall have attained the age of twenty-five (25) years, my Trustee shall pay over to the said William Michael Tuffs all of the unexpended principal and income of the trust estate.

"4. In the event of the death of said William Michael Tuffs prior to his attaining the age of 25 years, my Trustee shall pay over to his father, William Sherman Tuffs, all of the unexpended income and principal of the trust estate.

"5. In the event of the death of said William Sherman Tuffs prior to the death of William Michael Tuffs or he is otherwise unable to take the remainder of said trust estate upon the death of his son, my Trustee shall pay over the remaining income and principal of said trust estate to the residuary heirs of my trust estate in the proportions and to the individuals provided in Paragraph Sixth."

(To distinguish this from the trust provisions of the James T. Tuffs will, which we will later discuss, we will refer to this provision as the Sessions Trust and occasionally point to certain paragraphs as above numbered.)

The first question confronting us is whether Michael thereunder took a vested or contingent interest.

"No interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." Gray, The Rule Against Perpetuities (4th ed 1942), 191 § 201. Such is the law in Oregon. *Heilig v. Daniel*, 203 Or 123, 129, 275 P2d 854, 278 P2d 988 (1955), citing cases. It is a rule of property, not one of construction. 41 Am Jur

58, Perpetuities and Restraints on Alienation § 13. If the interest is a vested one, the rule is not applied.

Contestants insist that the exercise of the power in favor of Michael did not create in him a vested interest upon the death of the donee, Mrs. Sessions. They interpret the provision for survivorship by the appointee to the age of 25 as attaching to the substance of the gift as a condition precedent, which, if correct, would render the gift contingent.

The defendants' position on this vital matter is: that Michael's interest vested as of the date of Mrs. Sessions' death. Here, we set aside for the moment any reference to the provision for William Sherman Tuffs (Sessions Trust, par. 4), to which we will give attention in our consideration of the contestants' third and last assignment of error.

More specifically, we must ascertain whether the testatrix intended to provide for Michael only in case he reached the age of 25, in which event the gift would not vest in interest until that time, or, on the other hand, whether the postponement to age 25 is merely referable to the relative feasibility of entrusting him with the property and, therefore, relates only to the time of its fullest enjoyment, thereby creating an estate defeasibly vested in the beneficiary upon the death of the testatrix.

At the outset, contestants argue in prime support of their thesis that in determining the validity of the appointment, the period of legal remoteness must be calculated from the time the power was created. If true, in this matter, such time would be the date of the death of James T. Tuffs, i.e., July 14, 1947.

To the contrary, the defendants declare that the time of the exercise of the power of appointment by the donee should be employed to reckon the period of

remoteness. If applied here, it would be March 13, 1951.

These two divergent rules both have judicial support. In terms of the numerical quantity of cases, the rule advanced by the contestants might well be said to be the majority rule and the one urged upon us by the defendants appropriately classified as the minority rule.

The matter of making a choice between these rules has not heretofore confronted this court. We can well conceive that under conditions different from those here present, a choice might be necessary because dissimilar results might be produced, but we find, under the circumstances present in this case, no need to resolve our judgment in favor of either to the exclusion of the other.

Our reason for deferring a choice between these rules urged by the respective parties is because the application of either still leaves us with the necessity of determining whether or not there is a vesting of Michael's interest as of the date of Mrs. Sessions' death as a matter preliminary to the application of the Rule Against Perpetuities.

The contestants, turning to the text of the trust, seek in invoke support for their position that the gift did not vest on Mrs. Sessions' death by pointing to the words: "When the said William Michael Tuffs shall have attained the age of twenty-five (25) years, my Trustee shall pay over to the said William Michael Tuffs all of the unexpended principal and income of the trust estate" (Sessions Trust, par. 3) and claim that it does not create a vested interest until that time. They next assert that a mere power to pay "so much of the net income of the trust estate and such sums from the principal as my Trustee shall deem necessary or ad-

visable in its sole discretion" (Sessions Trust, par. 1) constitutes a nonvested discretionary trust which when continued for 25 years is void.

We will give consideration to both of these arguments in due course, but before doing so, we deem it appropriate, because of the absence of any clear expressions of intention in Mrs. Sessions' will, to state and discuss various canons of construction of long standing and relevant to the determination of intention as bearing on the matter of the vesting of the interest.

We first note Professors Simes and Smith's pertinent and cautionary comment:

> "The result in any given case is no mere balancing of the presumption in favor of a vested construction against the rule that the gift is contingent if futurity is annexed to the substance of the gift. It is reached by a weighing of the effect of a large number of conflicting presumptions of more specific character, coupled with an ever present desire to give effect to the underlying intent of the testator. * * *" (Simes and Smith, The Law of Future Interests (2d ed), 12 § 576)

The following principles of construction are applicable to the facts of this case in the formulation of our final judgment.

### The Constructional Preference

■ It is well settled in this jurisdiction that an interest should be construed as vested rather than contingent if it is possible to do so consistent with other rules of law. *Williamson v. Denison and Groves,* 185 Or 249, 254, 202 P 477 (1949); *Stevens v. Carroll,* 64 Or 417, 419, 129 P 1044 (1913); *Winslow v. Rutherford,* 59 Or 124, 128, 114 P 930 (1911). Early vesting is uniformly treated as more in accord with the public in-

terest because it quickens commerce in the ownership of property by facilitating alienability to a considerable degree. 3 Restatement 1218, Property (Future Interests) § 243.

This preference favoring vesting is reinforced in perpetuities cases by another hornbook axiom. It is one of choice between two constructional possibilities.

We find it stated as follows in *Closset v. Burtchaell*, 112 Or 585, 230 P 554, at page 602:

> "\* \* \* If there are any doubtful or ambiguous expressions to be found in the will which are fairly capable of two constructions, one of which would produce a legal and the other an illegal result, it would be the duty of the court to give the will that construction which would produce a legal result. 'Where doubtful expressions are used touching a contingent gift, there is of necessity place for construction, and the law, in such a case, favors the preservation rather than the defeat of the gift. "It is a fair presumption that the testator meant to create a legal rather than an illegal estate." ' Note to 1 Jarm. on Wills (6 ed.), \*217; \* \* \*."

See, also, *Rust v. Rust*, 147 Tex 181, 211 SW2d 262, aff'd 214 SW2d 462 (1948); VI American Law of Property, 58 § 24.19; 2 Page, Law of Wills (Lifetime ed) 842 § 925; 3 Page, supra, 695 § 1259; 41 Am Jur, supra, 58 § 12.

This preferential rule is so favorably regarded by some courts that only a clearly expressed intention to the contrary in positive terms will warrant a finding that the interest is contingent. *Bryant v. Plummer*, 111 Me 511, 90 A 171, 173 (1914); *In re Robinson's Estate*, 90 Vt 328, 98 A 826, 828 (1916); *In re Newlin's Estate*, 367 Pa 527, 80 A2d 819, 823 (1951); *Liebhardt v. Avison*, 123 Colo 338, 229 P2d 933, 937 (1951);

*Sorrels v. McNally,* 89 Fla 457, 105 S 106, 110 (1925);
3 Page, supra, 693, 694 § 1259.

### Annexation of the Conditional Element

■ Where the purported words of futurity are embodied in the description of the gift, the interest is construed as contingent. However, if the conditional element is not annexed to the words of the gift, the interest is construed as vested, and the suspensive expression is said to refer to payment or possession and enjoyment. The postponement of payment and enjoyment does not hinder vesting. *Winslow v. Rutherford,* supra (59 Or at 129); *Stevens v. Carroll,* supra (64 Or at 419). See *Warren v. Hembree,* 8 Or 119, 123 (1879); 3 Page, supra, 697 § 1260; Simes and Smith, supra § 576.

■ Where there is doubt cast as to whether the contingency is annexed to the gift itself or to the time of payment and enjoyment, "courts are inclined to construe them rather as applying to the time of payment, and to hold the gift rather as vested than contingent." *Eldridge v. Eldridge,* 63 Mass 516, 519 (1852); *Dale v. White,* 33 Conn 294, 296 (1866); *In re Mansur's Will,* 98 Vt 296, 127 A 297, 299 (1925); *Hoblit v. Howser,* 338 Ill 328, 170 NE 257, 259 (1930); 2 Redfield, The Law of Wills, 248.

### Payment of Intermediate Income

■ A gift of the intermediate use or income to or for the benefit of the legatee is the strongest factor tending to show that the gift is vested, and not contingent upon attaining the specified age. This is also the rule where the income is given by way of a trust for maintenance and support. *Safe Deposit Box & Trust*

*Co. v. Wood,* 201 Pa 420, 50 A 920, 922 (1902) ; *In re Mansur's Will,* supra (127 A at 299) ; *Armstrong v. Barber,* 239 Ill, 389, 88 NE 246, 250 (1909) ; *First & American Nat. Bank of Duluth v. Higgins,* 208 Minn 295, 293 NW 585, 595 (1940) ; *Sorrels v. McNally,* supra (105 S at 110) ; Simes and Smith, supra, § 588; VI American Law of Property, supra, 58, 61 § 24.19; 57 Am Jur 807, Wills § 1224; 3 Restatement, supra, 1297 § 258. See Prof. Edward J. Fruchtman's article: "The Effect of a Gift of Intermediate Income Upon the Vesting of Legacies," 10 Temple LQ 41, 47 (1935) ; Kales, Future Interests, § 218. The telling force of this circumstance is to be found in decisions which apply the rule even where futurity is embodied within the description of the gift. *Clay v. Security Trust Co.,* 252 SW2d 906, 908 (Ky 1952) ; *Appeal of Reed,* 118 Pa St 215, 11 A 787, 789 (1888).

We pause here to note that the contestants claim that a trust with discretionary powers does not create a vested interest (Sessions Trust, pars. 1 and 2). At one time this contention of the contestants might have had some merit, but since *Fox v. Fox,* infra, was decided in 1875, the trend has been consistently to the contrary and to such an extent that we find that contestants' argument in support is without merit. Our own research has led us to no cases in this country contrary to the doctrine asserted in Fox.

The same inference propitious to vesting when the beneficiary takes the intermediate income for the maintenance and education likewise obtains, notwithstanding a discretion is given to the trustee to employ less than the whole income for those purposes.

We have already made reference to the leading case where we first find this rule: *Fox v. Fox,* LR 19 Eq 286 (1875). See, also, *Rhode Island Hospital Trust*

*Co. v. Noyes*, 26 RI 323, 58 A 999, 1005 (1904), following *Fox v. Fox*, supra; *Hayes v. Robeson*, 29 RI 216, 69 A 686, 687 (1908); *Felton v. Sawyer*, 41 NH 202, 212; *In Re Williams*, 1 Ch 180, 183 (1907); *Fidelity Union Trust Co. v. Dignan*, 105 NJ Eq 750, 146 A 466-468 (1929); *Harlacker v. Clark*, 115 Vt 261, 56 A2d 468 (1948); *Rust v. Rust*, supra (211 SW2d at 267); *Hersey v. Purington*, 96 Me 166, 51 A 865, 867 (1902); *Schmidt v. Schmidt*, 261 SW2d 892, 897 (Tex 1953); 57 Am Jur 807, Wills, § 1224; LRA 1918 E 1116, 1117; 3 Restatement, supra, 1301 § 258 comment (f); V American Law of Property, 158 § 21.20 (1952); Morris and Leach, The Rule Against Perpetuities, 46, 47 (1956); 34 Halsbury, Laws of England, 394, Wills § 439 (Hailsham ed 1940); Fruchtman article, supra, 10 Temple LQ, at 47, et seq.

■ The discretion in the trustee does not nullify the effect of vesting. A persuasive statement of the reason for the rule is found in *Wilson v. Knox*, LR 8 Irish Eq 349, 359 (1884):

> "If there be a clear gift of the entire income for maintenance, its effect in vesting the legacy may not be nullified by the mere circumstance that there is a discretion in the trustee so to employ less than the whole income, that discretion being presumably for the benefit of the object of the gift. * * *"

Moreover, it is subject to judicial control (*Rust v. Rust*, supra (211 SW2d at 267)).

### The Power to Invade the Corpus

■ The power of the trustee to expend the corpus, pending final distribution, for the use of the income beneficiary's intermediate maintenance and education, is strongly indicative of an intention that the beneficiary's interest vested upon the testator's death (Sessions Trust, pars. 2 and 3). *In re Trevor's Will*, 120

Misc Rep 22, 197 NYS 719, 727 (1922); *First & American Nat. Bank of Duluth v. Higgins,* supra (293 NW 585, 595), citing cases.

### *The Interposition of a Trust by Severance Instanter*

██ The interposition of a trust in the gift of a legacy or devise does not militate against the immediate vesting of the beneficiary's equitable interest (*Jackson v. Langley,* 234 NC 243, 66 SE2d 899, 900 (1951); *First & American Nat. Bank of Duluth v. Higgins,* supra (293 NW at 595); *Rust v. Rust,* supra (211 SW2d at 267); *Simes and Smith,* supra, 207 § 166; 3 Page, supra, 701 § 1261; 57 Am Jur, supra, 809 § 1226; 96 CJS 437, Wills § 961; LRA 1918E, supra, at 1127), for it is universally recognized that there may be a vested interest in an equitable, as well as a legal, estate, both being governed by identical rules of construction with respect to vesting.

█ The testamentary gift in trust harmonizes with the concept of immediate vesting in that it shows a severance instanter of the legacy from the bulk of the testator's estate. *In re Mansur's Will,* supra (127 A at 299); *Bush v. Hamill,* 273 Ill 132, 112 NE 375, 377 (1916); *Wessborg v. Merrill,* 195 Mich 556, 162 NW 102, 106 (1917); *Gifford v. Thorn,* 9 NJ Eq 702, 708, 709 (1885); 57 Am Jur, supra, 809 § 1226; LRA 1918E, supra, at 1128.

### *The Effect of Use of Introductory Adverbs: "When," "At," "Until"*

█ "* * * The apparent conflict between the statement so often found in the cases that 'when' and 'at' are words of contingency, and the actual decisions to the effect that the gift is vested where these words

are used, may be explained by the fact that there is generally a gift of a preceding particular estate or a gift of intermediate income to the legatee or devisee. The American cases support a presumption of a vested and transmissible interest where there is a gift of realty or personalty to a person 'at' or 'when' he attains a given age, and there is an intermediate gift of income to him or an intermediate gift of a particular estate to some one else. * * *" Simes and Smith, supra, § 586, p 36. This is an accurate statement of the American decisions. *Cropley v. Cooper*, 86 US 167, 174, 177, 22 Led 109 (1873); *Bush v. Hamill*, supra (112 NE 376); *Fidelity Union Trust Co. v. Rowland*, 99 NJ Eq 72, 132 A 673 (1926); *Morrell v. Building Management*, 241 NC 264, 84 SE2d 910, 912 (1954); *Hersey v. Purington*, supra (51 A at 867); *Clay v. Security Trust Co.*, supra (252 SW2d at 908); *Eldridge v. Eldridge*, supra (63 Mass at 518). Considered in terms of the particular content of the wills there reviewed, cases cited by the contestants may be said to support the foregoing textual proposition. *Allen v. Burkhiser*, 125 NJ Eq 524, 6 A2d 656, 657 (1939); *Heberton v. McClain*, 135 F 226, 227 (ED Pa 1905); *Fidelity & Columbia Trust Co. v. Tiffany*, 202 Ky 618, 260 SW 357, 359 (1924). But in no instance do they approximate the trust provision of Mrs. Sessions' will. See, also 3 Restatement, supra, §§ 258, 259. The type of will exemplified by the foregoing cases of contestants is recognized and so classified in V American Law of Property, supra (156 § 21.20). 57 Am Jur, supra, 805, 806, §§ 1221, 1222.

■ Article Fourth of the Sessions' will in its entirety indicates that Michael took a vested equitable interest subject to the trust provisions, since it unconditionally vests legal title in the trustee for the primary

"use and benefit" of the boy. These are the direct words importing a beneficial gift to him; *there are no words of futurity annexed to this portion of the instrument.* See *Rust v. Rust,* supra (211 SW2d at 267); *Fidelity Union Trust Co. v. Dignan,* supra (146 A 466, 468); *Singer v. Singer,* 150 Tex 115, 237 SW2d 600, 605 (1951). "A gift in this form is in equity equivalent, in all respects, to a direct gift to the *cestuis que trustent.*" *Neilson v. Bishop,* 45 NJ Eq 473, 17 A 962, 964 (1899).

The direction to the trustee to "pay over" to Michael at the given age is not reasonably susceptible of the construction that his title had not theretofore vested, but was to vest initially as of that date. *Rust v. Rust,* supra (211 SW2d at 267). The words of futurity are not attached to the substance of the gift, but, on the other hand, they are referable to paying over, or the time of distribution, payment and ultimate possession by the beneficiary.

The survivorship clause is not devoid of meaning and effect. It does signify when the final payment is to be made, and when complete enjoyment and possession is to commence. In this sense the failure to attain the given age is a condition subsequent serving only to defeat Michael's vested equity. Until the divesting contingency occurs, his interest possesses all qualities, except indefeasibility, of one absolutely vested. Attainment of the specified age will vest the interest absolutely.

From these constructional tokens and their cumulative weight, it is readily apparent that the survivorship clause in the Sessions' will was not intended to defer the vesting of any equitable title in Michael. His interest vested upon her death, subject only to postponed enjoyment of the corpus.

Since there was an instanter vesting of both legal

and equitable title without any suspension thereof, and only the postponement of full enjoyment of the assets by Michael, the Rule Against Perpetuities has no application to this case.

## CHARGE OF VIOLATING POWER OF APPOINTMENT

We now come to the last of the major questions posed for solution by the contestants.

It has its genesis in the will of the testatrix' brother, James T. Tuffs, and centers in the clear and positive reflection of his antipathy toward Helen Dunham and her son, William Sherman Tuffs, the grandson of James T. Tuffs, and the son of William G. Tuffs.

The contestants argue that by the exercise of the power in favor of Michael and by conferring upon his father, William Sherman Tuffs, a contingent interest in the trust created for Michael, Mrs. Sessions unlawfully violated one of the express conditions of the power.

Turning to the will of James T. Tuffs, we find that the first two articles contained conventional directions to his executor. Article Three makes a specific bequest of apparel, jewelry, heirlooms, etc., to his sister Minnie.

The residue and remainder of his estate and the property of greatest value is by article Four given to The First National Bank of Portland, in trust, for the use and benefit of his two surviving sisters, Minnie and Jennie, and his then two only sons, William G. and James H. Tuffs, "in the manner hereinafter set forth; ["but"] *in no event shall HELEN DUNHAM or WILLIAM SHERMAN TUFFS, her son, be entitled to any share or interest in any of the trusts herein created."* (Emphasis ours.)

Article Five supplements the text of article Four and makes clear the phrase: "in the manner hereinafter set forth." Article Five, as far as pertinent, reads:

"My trustee shall divide my estate into three portions, one portion each for my two sons and one portion for my two sisters, from each portion separate trusts shall be established.

"The trust for my son, William G. Tuffs, shall consist of my interest in the business property located at * * * and presently occupied by Kampfer's Store. * * *"

This is followed by directions with reference to the disposition of the income from the Kampfer Store property as between William G. Tuffs and Minnie Tuffs. Article Five then continues provision for the trust in favor of his son James H. Tuffs, as follows:

"The trust for my son, JAMES H. TUFFS, shall consist of the business property located at 200 South Sixth Street, Grants Pass, Oregon. * * *"

Immediately after the foregoing are instructions for the disposition of the income from the property during the lifetime of James H. Tuffs and instructions to the trustee as to the sale of either of the parcels of real property given to his sons. Following that, we come to the testamentary direction of the fifth article in which our interest has its greatest concern:

"Upon the death of either of my sons the trust herein created for his benefit shall terminate and shall be distributed to the trust herein created for the benefit of my two sisters, Minnie L. Tuffs and Jennie M. Sessions, or in the event of their prior death, to the trust for my surviving son. Upon the death of my surviving son, should both of my said sisters be deceased, his trust shall be terminated and the assets distributed to my heirs at law, *except, however, that HELEN DUNHAM or her son, WILLIAM SHERMAN TUFFS, shall not be con-*

*sidered an heir or heirs and in no event shall either of them be entitled to any distributive share from my estate, or the trusts created herein.*

"All of the rest of my estate, including all personal property not bequeathed in THREE above, and all real property not placed in trust for the benefit of my two sons, shall be held in trust for the benefit of my two sisters, MINNIE L. TUFFS and JENNIE M. SESSIONS. My trustee shall pay to or for their, or either of their, benefit such sums as it shall, in its discretion, deem necessary or advisable for their proper maintenance, support and general comfort. Upon the death of the survivor of them this trust shall be terminated and the assets distributed as the said survivor shall by will appoint; if my said sister shall die intestate, or shall die testate but fail to make such appointment, then to the trusts herein created for my two sons, share and share alike, or to the trust of the survivor, should one be dead; should both of my said sons be deceased, the assets remaining shall be distributed to my heirs at law." (Emphasis ours.)

James had predeceased his aunt, Mrs. Sessions, and, therefore, the property held in trust for him was added to and became a part of the trust created by the Tuffs will for the benefit of herself and sister. And so, too, would have the corpus of the trust set up for the son, William, had he predeceased them. He, however, is still living. When he dies, the corpus of the trust for him when terminated will be "distributed to my heirs at law [i.e., of James T. Tuffs], except, however, that HELEN DUNHAM or her son, WILLIAM SHERMAN TUFFS, shall not be considered an heir or heirs * * * ."

Therefore, on the death of Mrs. Sessions, the great bulk of her brother's estate, except that part left in trust to his son William, was concentrated in the trust

fund for which she was empowered to appoint by will.

■ The courts are admonished by ORS 114.210 to have a due regard "to the directions of the will and the true intent and meaning of the testator in all matters brought before them." To the accomplishment of that purpose we have held that the cardinal principle to be applied in construing a will, when construction is necessary, is to ascertain from the entire instrument the expressed intention of the testator. We are taught to ascertain from the testamentary words, construed according to their natural meaning, the intent of the testator and to give effect to that intent unless the same is prohibited by some positive rule of law. *Florey v. Meeker*, 194 Or 257, 282, 240 P2d 1177.

■ The nature and extent of a testamentary power of appointment depends primarily on the language of the will conferring it and whether a donee of a power has duly executed the power depends upon the intention of the donor as gathered from the terms of the donor's will and will be construed by the same methods as applied to other provisions of the will. *Equitable Trust Co. v. Foulke,* 28 Del Ch 238, 40 A2d 713; *United States Trust Co. v. Montclair Trust Co.,* 133 NJEq 579, 33 A2d 901, 903; *Regents of the University System v. Trust Co.,* 186 Ga 498, 198 SE 345, 350; *In re Howald's Trust,* 65 Ohio App 191, 29 NE 575; *In re Ree's Estate,* 233 Wis 635, 290 NW 167; *Massey v. Guaranty Trust Co.,* 142 Neb 237, 5 NW2d 279; 96 CJS 716, Wills § 1068(a); 72 CJS 412, Powers § 22; 41 Am Jur 812, Powers § 9; Chaplin, Express Trusts and Powers, 642 § 757.

"The intention of the donor of the power is the great principle that governs in the construction of powers, and in furtherance of the object in view the

courts will vary the form of executing the power, and, as the case may require, either enlarge a limited to a general power, or cut down a general power to a particular purpose." 4 Kent Comm. 345, quoted in *Ryan v. Daly,* 99 NJ Eq 585, 589, 134 A 546, 547, aff'd 137 A 918; *United States Trust Co. v. Montclair Trust Co.,* supra (33 A2d at 903); *Regents of the University System v. Trust Co.,* supra (198 SE at 350); 72 CJS, supra, at p 413.

■ If, therefore, it appears from the James T. Tuffs' will that it was the intention of the testator that the power of appointment conferred on his sister should have been executed by her without favoring William Sherman Tuffs, this court has no power to frustrate that intention and devise or approve of a different method not in harmony with his intentions. Such judicial action would be to substitute the judgment of the court for the judgment of the testator in the distribution of his bounty.

Reverting to the Tuffs' will, we find articles Four and Five create three trusts from the residue of his estate and which, as we have observed, constituted the great bulk of his wealth. Article Four has but two functions: (1) to convey the residuum of his estate to the bank, in trust, for his sons and his sisters; and (2) to proscribe Helen Dunham or William Sherman Tuffs, her son, as beneficiaries and who, in no event are "entitled to any share or interest *in any of the trusts herein created.*" (Emphasis supplied.) The property for which Mrs. Sessions held a testamentary power of appointment consisted entirely of trust property tinctured by the limitations imposed against Helen Dunham and her son as found in articles Four and Five.

In article Five we not only find the division made

of all the rest and remainder of the testator's estate into three trusts, but the provisions relating to the further disposition upon their respective terminations. From a reading of this article evolves a clear pattern of Mr. Tuffs' determination that none of his property would ever reach Helen Dunham or her son. After providing if his sisters shall predecease his sons, the trust set up for his sisters shall merge with the trust established for his surviving son or sons, and upon the death of the last surviving son, the article directs the assets be "distributed to my heirs at law, except, however, that HELEN DUNHAM or her son, WILLIAM SHERMAN TUFFS, shall not be considered an heir or heirs and in no event shall either of them be entitled to any distributive share from my estate, *or the trusts created herein.*" (Emphasis supplied.)

Not only are Dunham and William Sherman Tuffs barred from receiving any trust property by article Four, but the testator carefully avoided their reach and taking on termination by a reiteration of the same thought in article Five, the article which creates the power of appointment exercised by Mrs. Sessions.

■ We are persuaded, therefore, that Mrs. Sessions' provision in her will making William Sherman Tuffs a contingent beneficiary on the death of his son, Michael, before Michael attained 25 years of age, was an invalid exercise of the power and ineffective to create any species of right, interest or estate in William Sherman Tuffs.

But do these proscriptions against William Sherman Tuffs extend to Michael so as to deny him the estate created for him under the power? The contestants insist that it militates against both William Sherman and Michael. We think to the contrary.

It is evident from a reading of the will that James

T. Tuffs entertained such a deep feeling of displeasure toward Mrs. Dunham and her son and to the extent that, in his carefully drawn will, he closed all possible doors to their participation in his estate. But it is also evident to us that it was a feeling essentially against them as particular personalities. Michael, however, was not born at the time the senior Tuffs executed his will, nor, indeed, until after the testator's demise.

■ In our opinion, there is neither evidence of intention nor authority nor logic to support a construction that the provision excluding Helen Dunham and William Sherman Tuffs as an "heir or heirs" of the testator extends to Michael by implication. See *Love v. Walker,* 59 Or 95, at p 108, 115 P 296 (1911), where we said: "It is a well-recognized legal principle that an heir at law can only be disinherited by express devise or necessary implication." That the feeling of James T. Tuffs was limited to the two persons he disinherited and no others, is made further manifest by the fact he at no place in his carefully conceived and constructed testament extended this feeling to their possible lineal descendants. Had he so felt, there were two appropriate places in the will where he could have inserted after their names, "or their heirs," or a phrase of equal import. A more logical implication would seem to support the conclusion that in a will evidencing so much forethought and consideration and careful legal draftsmanship, the testator would not have omitted such words of disinheritance if such was his desire and intent. See 57 Am Jur 757, Wills § 1160, where it is said:

> "In the absence of plain words in the will to the contrary, the presumption is that the testator intended that his property should go in the legal channel of descent, and if it is uncertain and doubtful whether the testator intended to devise real es-

state, the title of the heir must prevail. Other things being equal, there is a presumption against any intention on the part of a testator to disinherit his legal heirs, who are favored by the policy of the law and may not be disinherited by mere conjecture. When a testator intends to disinherit those who would take under the statutes of descent he must indicate that intention clearly, by plain words, express devise to others, or necessary implication. * * *"

■ In the phrases foreclosing Helen Dunham and William Sherman Tuffs of any right to inheritance, we find no ambiguity. They are of a clear and incisive meaning. Nor do we find elsewhere in the will anything which by implication or otherwise subtracts from or adds to what is there so concisely said. "There is no occasion for construction where the meaning is clear and there is no ambiguity in the language of the will. The court will not seek to read into a will an intent different from that expressed therein." *Pioneer Trust Co. v. Thielsen,* supra (199 Or at 214). See, also, *Heimbigner v. U. S. Nat. Bank,* 190 Or 592, 597, 227 P2d 827.

■ But the contestants would have us read into the proscription clauses by implication words which would give them construction for which they contend. But this we cannot do, as will be discovered by reference to *Quick v. Hayter,* 188 Or 218, 223, 215 P2d 374:

> "*In re Holland's Estate,* 180 Or. 1, 6, 175 P. (2d) 156, this court said:
> " "* * * As was said in Stubbs v. Abel, et al., 114 Or. 610, 233 P. 852, 236 P. 505, the purpose is to enable the judge to fit himself into "the position of the testator, in order to think as he thought, and to understand as he understood." But none of our law empowers the court to determine what the testator intended to say:

§ 2-216 O.C.L.A.: Hansen v. Oregon Humane Society, 142 Or. 104, 18 P (2d), 1036; Page on Wills (Lifetime Ed.), § 914; Wigmore on Evidence (3d Ed.), Sec. 2459.'

"It is said by this court *In re Shepherd's Estate*, 152 Or. 15, 36, 41 P. (2d) 444, 49 P. (2d) 448, that:
" '* * * It is not, however, for the court to speculate upon what he might have done if the exact situation which has arisen had been in his mind when he made his will, but to determine the meaning of the words actually used and to apply that meaning to the facts presented. * * *'."

Holding, as we do that the appointment made in favor of Michael is valid and the contingent interest to his father, William Sherman, is invalid, we have one more question for consideration: are the valid and invalid elements separable?

■ The weight of authority is to the effect that a disposition of property under a power of appointment will not be held invalid in toto because a provision thereof is violative of the power, provided the invalid provision is severable from the valid provisions. *American Trust Co. v. Williamson*, 228 NC 458, 46 SE2d 104, 108 (1948); *Old Colony Trust Co. v. Richardson*, 297 Mass 147, 7 NE2d 432, 434, 121 ALR 1218 (1937); *Welch v. Morse*, 323 Mass 233, 81 NE2d 361, 363 (1948); *De Charette v. De Charette*, 264 Ky 525, 94 SW2d 1018, 1021 (1936); 3 Restatement, supra, 1995 § 362; 41 Am Jur 861, Powers § 76; 96 CJS 732, Wills § 1070, n 13. Whether separability is possible is determined from the donee's intent as ascertained from her will. *Old Colony Trust Co. v. Richardson*, supra; *Loring v. Blake*, 98 Mass 253, 261, 262 (1867).

■ The tokens of intention gathered from the language and arrangement of Jennie Sessions' last will

and testament lead to a single conclusion; that Michael's appointment is precedent and clearly separable from the attempted appointment in favor of his father, William Sherman Tuffs. The latter's purported interest being invalid does not vitiate the precedent equitable fee vested in the boy.

We have carefully reviewed the host of authorities cited to us by the respective parties on each of the several issues. If we have not made particular reference to all of them, it is because, in the main, they appear to us patently inapplicable to the facts in the instant matter or are readily distinguishable from the decisions we deem controlling.

The decree will be modified in accordance with this holding. Costs and disbursements taxed to appellants.